**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA GAINESVILLE DIVISION**

**UNITED STATES OF AMERICA**

**CASE No: 1:20cr10-AW/GRJ-1**

**v.**

**RODDRAE ANTONIO WILLIAMS**
**a/k/a "Drae"**
**a/k/a "Juice"**
**a/k/a "Juvie"**
______________________________/

## STATEMENT OF FACTS

The Defendant, Roddrae Antonio Williams, admits that, if this case were to proceed to trial, the Government could prove the following facts beyond a reasonable doubt.

**Introduction**

In the course of its investigation, the Government applied for and was granted more than two dozen search warrants, including tracking warrants and warrants for electronically stored information, authorization for more than two dozen pen-register/trap-and-trace devices, several 2703(d) orders, and six Title III wiretap orders.

On February 22, 2020, the Honorable Allen C. Winsor, United States District Judge, in Northern District of Florida case number 1:20mc13-AW/GRJ,

FILED IN OPEN COURT THIS
10-27-2020
CLERK, U.S. DISTRICT

authorized the interception of wire and electronic communications occurring to and from (407) 714-7318 (TARGET TELEPHONE #1), whose primary user was the Defendant. The interception began on February 24, 2020 and terminated on March 24, 2020.

On March 17, 2020, the Honorable Allen C. Winsor, United States District Judge, in Northern District of Florida case number 1:20mc24-AW/GRJ, authorized the interception of wire and electronic communications occurring to and from (347) 640-0270 (TARGET TELEPHONE #2), whose primary user was the Defendant. The interception began on March 18, 2020 and terminated on April 13, 2020.

On April 3, 2020, the Honorable Allen C. Winsor, United States District Judge, in Northern District of Florida case number 1:20mc30-AW/GRJ, authorized the interception of wire and electronic communications occurring to and from (352) 231-4729 (TARGET TELEPHONE #3), whose primary user was Decoda King. An amended order was signed on April 6, 2020. The interception began on April 6, 2020. On May 5, 2020, the Court signed an order authorizing the continued interception of communications over TARGET TELEPHONE #3 for an additional 30 days. Interception terminated on May 20, 2020.

On April 8, 2020, the Honorable Allen C. Winsor, United States District Judge, in Northern District of Florida case number 1:20mc31-AW/GRJ, authorized the interception of wire and electronic communications occurring to and from (407) 714-7318 (TARGET TELEPHONE #1) and (505) 373-7957 (TARGET TELEPHONE #4), whose primary user was the Defendant. The interception began on April 9, 2020. On April 26, 2020, the Defendant obtained a new telephone number for the device assigned TARGET TELEPHONE #1 (same IMEI number but a new telephone number). A roll-over provision in the Court's order authorized the interception of wire and electronic communications occurring over this new telephone number, (850) 502-3756 (TARGET TELEPHONE #5). The interception of TARGET TELEPHONE #5 began on April 26, 2020. Interception of TARGET TELEPHONE #4 terminated on May 5, 2020.

On May 8, 2020, the Honorable Allen C. Winsor, United States District Judge, in Northern District of Florida case number 1:20mc39-AW/GRJ, authorized the continued interception of wire and electronic communications occurring to and from TARGET TELEPHONE #5, and the initial interception of communications to and from (224) 532-7694 (TARGET TELEPHONE #6), whose primary user was the Defendant. The interception began on May 8, 2020, and terminated on May 20, 2020.

**Count 1**

The Defendant is a long-time drug dealer who, during the period alleged in Count One, conspired with his co-defendants, and with other people, to distribute a wide range of controlled substances, including cocaine, cocaine base, commonly known as "crack cocaine," methamphetamine, oxycodone, marijuana, and buprenorphine (which is the controlled substance contained in Suboxone pills).

On November 4, 2019, the Defendant resisted arrest and fled from the Florida Highway Patrol. On November 5, 2019, the Defendant was arrested with approximately 27.7 grams of crack cocaine, 54.7 grams of powder cocaine, 242.6 grams of marijuana, and various drug paraphernalia including plastic baggies and a digital scale.

On May 20, 2020, a search warrant at the Defendant's mothers' residence, authorized by NDFL case number 1:20mj29-GRJ, revealed $17,000 cash and approximately 230 grams of powder cocaine, which belonged to the Defendant.

On May 20, 2020, the Defendant was arrested with $22,010 in loose cash in a backpack.

Some specific instances of conduct in furtherance of the conspiracy are discussed below, but these instances are illustrative examples only meant to establish a factual basis for the Defendant's plea, not an exhaustive list of all of his

knowledge about the conspiracy. Many other specific examples of the involvement of each co-conspirator discussed below exist. This statement of facts does not discuss the roles of currently unindicted co-conspirators, and the failure to include an unindicted co-conspirator in this statement of facts is not an indication that the person was uninvolved in the conspiracy.

### *Involvement of Elboric Robinson in the Conspiracy*

Elboric Robinson is also a long-time drug dealer, and, during the period alleged in Count One, the Defendant conspired with him to obtain and distribute more than 500 grams of cocaine and more than 28 grams or more of crack cocaine. The Defendant and Elboric Robinson would frequently pool their money to obtain cocaine at a lower cost-per-ounce than they could achieve by buying cocaine separately. The Defendant and Elboric Robinson would "cook" (manufacture) crack cocaine together, including doing so at Elboric Robinson's residence. The Defendant and Elboric Robinson would refer drug customers to each other, when they were too busy to make a sale themselves. The Defendant and Elboric Robinson would discuss police surveillance, and advise each other about the location of law enforcement. The Defendant would also supply Elboric Robinson with marijuana.

For instance, on February 25, 2020, Elboric Robinson and the Defendant jointly purchased 9 ounces of cocaine.

On March 1, 2020, Elboric Robinson and the Defendant discussed jointly purchasing a half-kilogram of cocaine from co-defendant Deocda King.

On May 12, 2020, Elboric Robinson and the Defendant agreed to jointly purchase 9 ounces of cocaine, but the purchase was not consummated. On May 13, 2020, Robinson directed the Defendant to come back and pick up his money.

On May 17, 2020, Elboric Robinson and the Defendant jointly purchased a kilogram of cocaine. The two then cooked crack cocaine together at Elboric Robinson's apartment.

***Involvement of Daniel Willis in the Conspiracy***

Daniel Willis is also a drug-dealer, and, during the period alleged in Count One, the Defendant conspired with him to distribute multiple controlled substances, including marijuana and 50 grams or more of a mixture containing methamphetamine. The Defendant supplied Willis with cocaine, crack cocaine, oxycodone, Suboxone, marijuana, and methamphetamine, which Willis resold.

For instance, Willis made trips to California on behalf of The Defendant and drove back car-loads of marijuana and marijuana oil cartridges, which the

Defendant had obtained from co-defendant Gregory Williams. On July 26, 2019, Willis was stopped by law enforcement in Grants, New Mexico, while making such a trip with approximately 23 kilograms of marijuana, and over 600 vials of marijuana oil.

On February 25, 2020, the Defendant and Willis discussed a potential source's prices for methamphetamine, and the Defendant directed Willis to investigate how much the source would charge for 9 ounces of methamphetamine.

On February 28, 2020, the Defendant obtained one ounce of methamphetamine from Decoda King and supplied it to Willis. Willis resold it to end-users, and reported back that the users were pleased with the quality of the methamphetamine.

On March 24, 2020, Willis asked the Defendant to help finance his purchase of 10 ounces of methamphetamine at $175 per ounce.

On March 26, 2020, the Defendant alerted Willis that Decoda King had methamphetamine available for purchase.

***Involvement of Lorenza Durr, Jr. in the Conspiracy***

Lorenza Durr, Jr. is also a drug-dealer, and the Defendant conspired with him to distribute cocaine and more than 28 grams of crack cocaine. Durr sold cocaine and crack cocaine on behalf of the Defendant, and the two split the profits

from the sales. The Defendant also supplied Durr with marijuana. On a daily basis, the Defendant would supply Durr with 3.5–7 grams of crack cocaine, and with 21–28 grams of powder cocaine, which Durr would sell or distribute at the Defendant's direction. The Defendant would frequently direct Durr to supply crack cocaine to co-defendant Morris Robinson, who also sold crack cocaine on behalf of the Defendant. Durr began working for the Defendant a few months before the Defendant's November 5, 2019, arrest, and continued working for him between the Defendant's release from jail on December 24, 2019, and the date of his federal arrest on May 20, 2020.

On April 10, 2020, the Defendant directed Durr to retrieve a Taurus 9 millimeter firearm and a grocery bag containing cocaine, crack cocaine, Suboxone, and marijuana, from an air conditioner vent at the Defendant's grandmother's house. The Defendant then arranged for Durr to provide co-defendant Morris Robinson, Jr. a "fifty pack" (i.e. $50 worth of crack cocaine) and directed Durr to grab "a couple pieces of boy" (i.e. crack cocaine) from the bag he had just retrieved, and to give them to Morris Robinson. Later that night, The Defendant then arranged a meeting at which he retrieved the bag and the firearm from Durr.

### *Involvement of Morris Robinson, Jr. in the Conspiracy*

Morris Robinson, Jr. is also a long-time drug-dealer, and, during the time period alleged in Count One, the Defendant conspired with him to distribute crack cocaine. Morris Robinson was a street-level crack dealer who was "fronted" crack cocaine by the Defendant (providing him with drugs on credit, with the expectation of payment at a later date). The Defendant did not trust Morris Robinson not to smoke the crack if he were fronted a large amount all at once, so the Defendant would provide the Defendant with smaller amounts of crack cocaine to resell, multiple times per day. The Defendant frequently directed co-defendant Lorenza Durr to accomplish these resupplies.

For instance, on April 13, 2020, Morris Robinson told the Defendant that he had $150 to pay him back for a previous drug debt, and asked to be fronted another $150 worth of crack.

On April 16, 2020, the Defendant asked Morris Robinson how much money had had. Robinson responded that he had $95 and "about three more rocks" (i.e. three more pieces of crack cocaine to sell). The Defendant told him that once Robinson had $100, to give it to him and he would resupply him with more crack cocaine.

***Involvement of Edward Garrison, Jr. in the Conspiracy***

Edward Garrison, Jr. is also a drug-dealer, and, during the time period alleged in Count One, the Defendant conspired with Garrison to distribute crack cocaine, cocaine, and marijuana. The Defendant would "front" Garrison crack cocaine and cocaine (providing him with drugs on credit, with the expectation of payment at a later date).

For instance, on February 29, 2020, Garrison and the Defendant discussed how much money Garrison had sent to the Defendant with "Cooter," (between $550-$560) because the Defendant believed that "Cooter" had been skimming money off the top.

On April 11, 2020, Garrison and the Defendant discussed how Garrison could make more money by buying crack cocaine in bulk, or buying powder cocaine from the Defendant and manufacturing it into crack himself, versus buying smaller "packs" of crack directly from the Defendant.

On April 12, 2020, Garrison and the Defendant discussed the current state of Garrison's debt to the Defendant, and how Garrison had recently paid $1000 towards it ("put a stack down"), paying his debt down from $1485 to $485, and had then paid an additional $160, bringing his total owed to $325. The defendant also agreed to provide Garrison with an additional half cookie of crack cocaine.

*Involvement of Rakeidra Neal in the Conspiracy*

Rakeidra Neal was an active drug-dealer during the beginning of the conspiracy, but had stepped back from daily drug-distribution activity by the end of the conspiracy. Even after stepping back from daily drug-distribution activity, Neal continued to assist the conspiracy by conducting occasional drug sales for the Defendant, and directing customers to the Defendant.

In 2017, Neal operated a drug-residence on 141st Street in Alachua, Florida, that was used by other members of the conspiracy including J.J., K.P., and K.Z. for the distribution of various controlled substances.

On February 25, 2020, Neal was the middle-man for a drug sale involving oxycodone arranged by the Defendant in which co-defendant Decoda King delivered oxycodone to Neal, and Neal then sold them to "Alex."

On several occasions in March and April, 2020, Neal sold cocaine on behalf of the Defendant to F.C.

On May 20, 2020, Neal warned the Defendant about law enforcement activity, and agreed to come pick him up from his girlfriend's house in an attempt to avoid arrest.

*Involvement of Decoda King in the Conspiracy*

Decoda King is a drug-dealer, and, during the time period alleged in Count One, the Defendant conspired with him to obtain and distribute oxycodone, more than 500 grams of cocaine, and more than 50 grams of methamphetamine. King was a source of methamphetamine, which the Defendant then provided to co-defendant Daniel Willis. King was also a source of cocaine, which he began obtaining from co-defendant Rayme Hernandez in late-April, 2020. The Defendant also sold King marijuana.

For instance, on February 28, 2020, the Defendant obtained one ounce of methamphetamine from King, which he then provided to Willis. Willis resold the methamphetamine to end-users, and reported back that the users were pleased with its quality.

On March 1, 2020, King sent the Defendant an electronic photograph via the Snapchat service in which King showed the Defendant half of one ounce of cocaine that King had just purchased. King indicated that he could provide the Defendant with as much cocaine of similar quality as the Defendant wanted.

On March 26, 2020, King alerted the Defendant that he had access to methamphetamine. The Defendant in turn alerted Daniel Willis.

On April 21, 2020, King alerted the Defendant that he had a potential new lead on cocaine (Rayme Hernandez) at $1300 per ounce. On April 22, 2020, King told the Defendant that he had purchased some of the cocaine and that he was trying to negotiate the price down lower with a bulk purchase. The Defendant and King agreed on splitting the purchase of 10 ounces of cocaine (5 ounces for each of them) in an attempt to reduce the price per ounce.

On April 25, 2020, the Defendant bought two ounces of cocaine from King, which King obtained from Rayme Hernandez.

On May 16, 2020, the Defendant agreed to purchase a kilogram of cocaine for $34,000 from King, which King planned to obtain from Rayme Hernandez. However, the deal fell through and the Defendant obtained cocaine through Elboric Robinson on May 17, 2020, instead.

***Involvement of Rayme Hernandez in the Conspiracy***

Between April 21, 2020, and May 20, 2020, Rayme Hernandez and Decoda King conspired to provide the Defendant with over 500 grams of cocaine.

On April 21, 2020, Rayme Hernandez alerted Decoda King that he could obtain large amounts of cocaine from a source of supply.

On April 22, 2020, Hernandez sold King one ounce of cocaine for $1300.

On April 25, 2020, Hernandez met with King and the Defendant, and sold the Defendant two ounces of cocaine.

On May 6, 2020, Hernandez told King that he could obtain a kilogram of cocaine for $32,000. King told Hernandez that he could resell the kilogram for $34,000 or $36,000, and the two agreed to split the profit.

The Defendant agreed to purchase a kilogram of cocaine for $34,000 from King and Hernandez, but delays occurred between May 10 and May 16, 2020, ultimately leading to the Defendant obtaining cocaine elsewhere.

***Involvement of Gregory Williams, Jr. in the Conspiracy***

During the time period alleged in Count One, Gregory Williams, Jr., conspired with Tomeka Bryant and the Defendant to distribute hundreds of pounds of marijuana. Gregory Williams obtained commercially grown marijuana and marijuana oil cartridges in California, and supplied them for distribution in the Gainesville, Florida, area through Tomeka Bryant and the Defendant.

The marijuana and marijuana oil cartridges that Daniel Willis was stopped with on July 26, 2019, were obtained from Gregory Williams. Willis had made other, similar trips prior to July 26, 2019.

After Willis was stopped on July 26, 2019, the Defendant began obtaining marijuana from Gregory Williams which Williams had sent to Gainesville via

mail/UPS/FedEx. The Defendant purchased multiple pounds of marijuana a week from Gregory Williams until the Defendant's arrest on May 20, 2020.

For instance, on April 21, 2020, the Defendant agreed with Gregory Williams to prepay Bryant $5000 to reserve two pounds of the "Gorilla Glue" strain of marijuana. On April 22, 2020, the Defendant met with Bryant and prepaid the $5000.

On April 28, 2020, the Defendant bought 4 pounds of marijuana (2 pounds of the "ice cream cake" variety, and two pounds of the "diesel" variety) from Gregory Williams.

On May 5, 2020, the Defendant bought 2 pounds of the "Doc OG" variety of marijuana. After the Defendant picked the marijuana up from Tomeka Bryant's residence, Gregory Williams called the Defendant and chastised him for bringing along Daniel Willis to Bryant's residence without permission.

***Involvement of Tomeka Bryant in the Conspiracy***

During the time period alleged in Count One, Tomeka Bryant conspired with Gregory Williams, Jr. and the Defendant to distribute hundreds of pounds of marijuana. Bryant received marijuana from Gregory Williams, collected money on Gregory Williams' behalf, and sent money to Gregory Williams.

For instance, from October 2, 2019, through October 21, 2019, Bryant accepted payments from the Defendant of at least $28,800 for the delivery of marijuana. The Defendant paid Bryant: $4800 (October 2), $4000 (October 12), $6000 (October 13), $4000 (October 14), $6000 (October 16), and $4000 (October 21). In exchange, the Defendant received 14 pounds of marijuana, most costing $2000 per pound.

The Defendant frequently negotiated directly with Gregory Williams, but would also deal directly with Bryant. For instance, on April 10, 2020, the Defendant reached out to Bryant directly to see how much marijuana she still had available for sale. Bryant told the Defendant that there were four pounds left, but that it was first come, first served situation, and that the marijuana would be sold by the morning. The Defendant asked about sending a courier to buy the marijuana, and Bryant told the Defendant to talk to "g" (Gregory Williams). The Defendant talked to Williams and ultimately decided to go himself to buy the marijuana. The Defendant went to Bryant's residence and completed the transaction.

***Involvement of Eric Williams in the Conspiracy***

Eric Williams (NDFL case number 1:20cr23-AW), is also a long-time drug-dealer, and, during the time period alleged in Count One, the Defendant conspired

with him to obtain and distribute more than 500 grams of cocaine. The Defendant obtained cocaine from Eric Williams between early 2018 and the Defendant's arrest on May 20, 2020. Sometime during late-2019, Eric Williams became the Defendant's primary source of supply for cocaine—after that point, the Defendant would purchase 3–4 ounces of cocaine from Williams every 2–3 days.

For instance, between April 17, 2020, and April 24, 2020, the Defendant purchased at least 12 ounces of cocaine from Eric Williams. On April 17, the Defendant asked to buy 3 ounces of cocaine, then talked to co-defendant Elboric Robinson, and increased his order to 7.5 ounces. However, Eric Williams told the Defendant that the price had gone up from $1025 to $1350 per ounce, which the Defendant and Elboric Robinson baulked at. On April 18, the Defendant agreed to pay $1350 per ounce, and told Williams to call him in the morning to find out exactly how many ounces the Defendant wanted to order. On April 19, Williams called the Defendant and told him that his source of supply was sold out, but that Williams would let the Defendant know as soon as there was more available. On April 20, 2020, Williams offered to sell the Defendant "a couple" of ounces he had gotten from a different source of supply, and they then met and consummated the transaction. On April 21, 2020, Williams agreed to sell the Defendant 7 ounces (the Defendant had asked for 9) and they then set up a meeting and consummated

the transaction. On April 24, 2020, Williams agreed to sell the Defendant 3 ounces (the Defendant had asked for 4) and they then set up a meeting and consummated the transaction.

**Count 2**

The Defendant used multiple cellphones while committing the drug-trafficking activity described in Count 1, and the cellphones promoted said activity by making it easier for the Defendant to arrange deliveries and stay in contact with his customers and his sources of supply. Specifically, the Defendant used the following communication facilities to promote the Conspiracy charged in Count 1:

(989) 430-0411 (referred to as PRIOR TELEPHONE #1)
(248) 200-6493 (referred to as PRIOR TELEPHONE #2)
(407) 714-7318 (referred to as TARGET TELEPHONE #1)
(347) 640-0270 (referred to as TARGET TELEPHONE #2)
(505) 373-7957 (referred to as TARGET TELEPHONE #4)
(850) 502-3756 (referred to as TARGET TELEPHONE #5)
(224) 532-7694 (referred to as TARGET TELEPHONE #6)

**Counts 3 and 4**

On April 10, 2020, the Defendant had co-defendant Lorenza Durr, Jr., retrieve a firearm and a grocery bag containing cocaine, crack cocaine, Suboxone, and marijuana, from an air conditioner vent at the Defendant's grandmother's house. The Defendant then arranged for Durr to provide co-defendant Morris Robinson, Jr. with a "fifty pack" (i.e. $50 worth of crack cocaine) and directed

Durr to grab "a couple pieces of boy" (i.e. crack cocaine) from the bag he had just retrieved, and to give them to Robinson. Later that night, the Defendant then arranged a meeting at which he retrieved the bag and the firearm from Durr.

On April 23, 2020, the Defendant had a firearm with him when he was shot at. In order to defend himself, the Defendant attempted to retrieve the firearm from a bag he was carrying, but the gunman was incapacitated when co-defendant Daniel Willis ran the gunman over with his truck before the Defendant had a chance to shoot back. Following the shooting, the Defendant attempted to locate additional firearms to arm several of his co-defendants.

On May 15, 2020, co-defendant Daniel Willis informed the Defendant that an individual known by the nickname "Butterhead" wanted to buy "that Taurus from you too."

On May 19, 2020, co-defendant Daniel Willis was attempting to locate his own firearms, and told the Defendant, "I had two nines. A Glock and a Taurus." "I had put it in my backpack" "I remember handing you your pistol but it could have been my pistol, I thought it was yours cause I had had had two of them on me. I said like hold this or something but I don't remember."

On May 20, 2020, the Defendant called co-defendant Rakeidra Neal to come pick him up because he had heard that search warrants had been executed at

several locations, that co-defendants Elboric Robinson and Morris Robinson, Jr. had been arrested, and the Defendant believed he saw law enforcement vehicles in the parking lot outside of his girlfriend's apartment. The Defendant told Neal that he had a firearm ("a stick") with him and asked for advice on what to do with it. Officers saw the Defendant leave through the back door of the apartment, and run back and forth behind a fence several times, before finally getting in a vehicle with Neal. A traffic stop revealed the Defendant hiding in the back of Neal's car with $22,010 in loose cash in a backpack, and wearing a single sandal. A search where the Defendant was seen running back and forth revealed a Taurus firearm and the matching other sandal.

Interstate nexus examination of the firearm and ammunition revealed they were: a Taurus PT111 G2 9mm pistol, Model Number: 1-111031G2-12, manufactured in Brazil and imported into the United States through Miami, Florida; 4 cartridges of Remington 9mm ammunition, manufactured in Lonoke, Arkansas; and 8 cartridges of Federal 9mm ammunition, manufactured in Lewiston, Idaho.

The Defendant knowingly possessed said firearm and ammunition to protect himself, including protecting himself from the risk of drug-related robberies and

shootings. At the time he possessed the firearm and ammunition, the Defendant was aware that he had previously been convicted of a felony. That is:

On or about June 4, 2011, the Defendant was convicted in the State of Florida, in Alachua County case number 01-2011-CF-002132-A, of Drugs: Possession of more than 20 grams of cannabis, for which he served a term of 40 months imprisonment and for which he was released from service of a term of imprisonment on or about September 1, 2014.

On or about June 4, 2011, the Defendant was convicted in the State of Florida, in Alachua County case number 01-2011-CF-004474-A, of Drugs: sale of controlled substance, for which he served a term of imprisonment of more than twelve months and for which he was released from service of a term of imprisonment on or about September 1, 2014.

On or about June 4, 2011, the Defendant was convicted in the State of Florida, in Alachua County case number 01-2011-CF-004475-A, of Drugs: sale of controlled substance, for which he served a term of 40 months imprisonment and for which he was released from service of a term of imprisonment on or about September 1, 2014.

On or about June 4, 2011, the Defendant was convicted in the State of Florida, in Alachua County case number 01-2011-CF-004476-A, of Drugs sale of

controlled substance, for which he served a term of 40 months imprisonment and for which he was released from service of a term of imprisonment on or about September 1, 2014.

On or about June 4, 2011, the Defendant was convicted in the State of Florida, in Alachua County case number 01-2011-CF-004477-A, of Drugs: sale of controlled substance, for which he served a term of 40 months imprisonment and for which he was released from service of a term of imprisonment on or about September 1, 2014.

On or about June 4, 2011, the Defendant was convicted in the State of Florida, in Alachua County case number 01-2011-CF-004528-A, of Drugs: sale of controlled substance, and Drugs: possession of cannabis with intent to sell, for which he served a term of 40 months imprisonment and for which he was released from service of a term of imprisonment on or about September 1, 2014.

Those convictions have not been set aside, the Defendant has not received a pardon, and his right to possess a firearm has not been restored. Since the Defendant has actually served a sentence of more than 12 months incarceration, he was aware that he had been convicted of an offense punishable by more than 12 months of incarceration.

## ELEMENTS

**Count 1: Conspiracy to distribute controlled substances,** PJI# O100

(1) two or more people in some way agreed to try to accomplish a shared and unlawful plan to distribute or possess with intent to distribute a controlled substance;

(2) the Defendant, knew the unlawful purpose of the plan and willfully joined in it; and

(3) the object of the unlawful plan was to distribute or possess with the intent to distribute more than 500 grams of cocaine, or 28 grams of cocaine base ("crack cocaine"), or 50 grams of methamphetamine.

**Count 2: Unlawful use of a communication facility,** PJI# O99

(1) the Defendant used a "communication facility";

(2) the Defendant used the facility while committing or helping to commit the crime charged in Count One; and

(3) the Defendant acted knowingly and intentionally.

**Count 3: Possession of a firearm in furtherance of a drug-trafficking offense,** PJI# O35.3 and O35.4

(1) the Defendant committed the drug trafficking crime charged in Count 1 of the indictment; and

(2) the Defendant knowingly possessed a firearm in furtherance of that crime, as charged in the indictment.

**or**

(2) that during and in relation to that crime the Defendant knowingly carried a firearm, as charged in the indictment.

**Count 4: Possession of a firearm by a convicted felon**

(1) The Defendant knowingly possessed a firearm;

(2) At the time of the charged act, the defendant had previously been convicted of a crime punishable by imprisonment for more than one year;

(3) At the time of the charged act, the defendant knew that he had been convicted of such an offense; and

(4) The firearm had been transported in interstate or foreign commerce.

LAWRENCE KEEFE
United States Attorney

THOMAS L. EDWARDS
Attorney for Defendant

10/27/20
Date

JAMES A. McCAIN
Florida Bar No. 0077536
Assistant United States Attorney
Northern District of Florida
111 N. Adams Street, 4th Floor
Tallahassee, FL 32301
850-942-8430
james.mccain2@usdoj.gov

RODDRAE ANTONIO WILLIAMS
Defendant

10/27/2020
Date

10/27/20
Date