**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA GAINESVILLE DIVISION**

**UNITED STATES OF AMERICA**
**Plaintiff,** **CASE NO.: 1:20-cr-00010-AW-GRJ-1**

**vs.**

**RODDRAE ANTONIO WILLIAMS,**

**Defendant. /**

## NOTICE OF FILING

**COMES NOW**, Defendant, **RODDRAE ANTONIO WILLIAMS**, by and through his undersigned attorney, **THOMAS L. EDWARDS**, and files the following transcript of Rakeidra Neal's Deposition taken on November 2, 2022 in Gainesville, FL in case 01-2019-CF-0263;01-2020-CF-3644-ABCD.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing has been furnished via **eservice** to Assistant United State Attorney, **James A. McCain**, at the Office of the U.S. State Attorney, located at 111 N. Adams Street Suite 400, Tallahassee, FL 32301-7730 at james.mccain2@usdoj.gov on this **1st** day of **February**, 2024.

Respectfully filed,

**Thomas L. Edwards, P.A.**
**& Christopher J. Jones**
**Attorneys at Law**

/s/ Thomas L. Edwards

**THOMAS L. EDWARDS**
Florida Bar Number: 0735035
4545 NW 8th Avenue
Gainesville, FL 32605
352-377-7800 (Telephone)
tome@lawfl.net
brandenw@lawfl.net

IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
IN AND FOR ALACHUA COUNTY, FLORIDA

STATE OF FLORIDA,

Plaintiff,
v. CASE NO. 01-2019-CF-0263
01-2020-CF-3644-ABCD

HAKIEM TRI-VONATE BROCKMAN,
McKENZLY ALPHAE EDWARDS, JR.,
RODDRAE WILLIAMS, and
JEFFERY ROBINSON,

Defendants.
_______________________/

DEPONENT: RAKEIDRA NEAL

DATE: November 2, 2022

TIME: 1:15 p.m.

PLACE: 209 SW 2nd Street
Gainesville, Florida 32601

APPEARANCES:

On Behalf of State:

Daniel R. Owen, Esquire
Assistant State Attorney
120 West University Avenue
Gainesville, Florida 32601

On Behalf of Hakiem Brockman:

William Miller, Esquire
Assistant Public Defender
151 Southwest Second Avenue
Gainesville, Florida 32601

On Behalf of McKenzly Edwards:

Yvens Pierre-Antoine, Esquire
301 Northeast First Avenue
Gainesville, Florida 32601

APPEARANCES CONTINUED:

On Behalf of Roddrae Williams:

Thomas L. Edwards, Esquire
4545 Northwest Eighth Avenue, Suite B
Gainesville, Florida 32605

On Behalf of Jeffery Robinson:

Stephen Bernstein, Esquire (Not present)
500 East University Avenue, Suite E
Gainesville, Florida 32601

On Behalf of Rakeidra Neal:

Huntley Johnson, Esquire
Johnson and Osteryoung, PA
226 Southwest 2nd Street
Gainesville, Florida 32601

I-N-D-E-X

Witness

RAKEIDRA NEAL

Examination by Mr. Pierre-Antoine 5

by Mr. Miller 27, 129

by Mr. Edwards 90, 131

E-X-H-I-B-I-T-S

(No exhibits offered.)

NOTARY PUBLIC: It is 1:15 on November 2, 2022. And this is a deposition being taken in State versus Hakiem Brockman, McKenzly Edwards, Roddrae Williams and Jeffery Robinson, case number 01-2019-CF-263-ABCD.

Would the attorneys state their appearances for the record.

MR. PIERRE-ANTOINE: Yvens Pierre-Antoine represent McKenzly Edwards.

MR. EDWARDS: Tom Edwards for Roddrae Williams.

MR. MILLER: William Miller on behalf of Hakiem Brockman.

MR. OWEN: Daniel Owen, Assistant State Attorney, and I have spoken with Stephen Bernstein who represents Jeffery Robinson and he's agreed to allow me to waive his presence. He cannot make it here today.

MR. JOHNSON: Huntley Johnson for Rakeidra Neal.

NOTARY PUBLIC: Ma'am, please raise your right hand to be sworn. Do you swear or affirm the testimony you are about to give will be the whole truth?

THE WITNESS: Yes, ma'am.

NOTARY PUBLIC: And please state your name for the record.

THE WITNESS: Rakeidra Neal.

NOTARY PUBLIC: Can you spell your first name for me?

THE WITNESS: R-A-K-E-I-D-R-A.

NOTARY PUBLIC: Thanks.

BY MR. PIERRE-ANTOINE:

Q Ma'am, can you state your date of birth for the record, please?

A August 23, 1990.

Q All right. And I represent McKenzly Edwards. Can you tell us how you know Mr. Edwards, if you do know him? How long have you known him, how's that?

A I've known him since about 2007.

Q And how did you -- are you guys from the same neighborhood? How did you guys meet up?

A We're from the same neighborhood.

Q And did you guys go to school together?

A No, I was older than him. I ain't never go to school with him.

Q Okay. So you basically just hung out in the same neighborhood and eventually you guys became accommodated with each other?

A Yes.

Q And I may jump around a little bit. If you're confused, just let me know and we can restate the question, okay?

I remember the last time we were -- we did a depo before and you were in custody. I'm assuming that sentence has

already been served, is that right?

A What you say?

Q You were in custody the last time, so you're out of custody, so I'm assuming whatever you were sentenced to has already been served?

A Yes.

Q Now, you did a proffer with law enforcement regarding this particular case. Do you remember that?

A Yes.

Q Now, were you offered anything in exchange for giving that proffer?

A Transactional immunity.

Q Okay. Were you given any other promises other than the transactional immunity?

A No.

Q And you weren't given -- you weren't -- like, charges wasn't presented to you as far as hey, we're going to pursue this if you provide us this proffer? In other words, sometimes law enforcement will say look, we got you here on these type of cases or what have you, and nothing like that was done with regards to you? Just transactional immunity?

A Yeah.

Q Okay. Now, I want to go back to reviewing some of the reports with regards to the FBI. Can you tell us when you were aware that there was a meeting -- when there was a meeting to

conspire to have Mr. Markham -- have Mr. Brockman kill someone? Can you tell us about that? When was the first time you heard about that?

A First time I heard about a meeting?

Q Yeah, about a meeting or was there -- was there a conversation? I mean you provided some testimony in your meeting about using Mr. Brockman. Do you know Mr. Brockman?

A Yeah.

Q How many times did you meet Mr. Brockman?

A A couple.

Q A couple times? Do you remember, like, when you met him or where did you meet him first? Was it in Alachua County?

A Yeah.

Q Okay. And can you tell us, like, where in Alachua County?

A The first time meeting him was at Drae dad house. I mean the first time seeing him, actually. I ain't really meet him, but I seen him.

Q And who was at that meeting at that Drae dad's house?

A Me, Drae, Tre and Tootie.

Q And who?

A Me, Drae, Tre and -- I don't know him by Brockman, I know him by Tre.

Q Okay. So you guys -- so you guys were -- what were you guys doing? Was there a party or was there a discussion being

had?

A I wasn't really in on the discussion, but I knew what he was there for.

Q And what was he there for?

A To shoot Markham, Jamari.

Q Okay. How do you know he was there to shoot Jamari Markham?

A Because prior to him coming, I had already talked to KP.

Q Okay. And who is KP?

A McKenzly.

Q And you talked to KP about -- regarding Mr. Markham?

A Yeah.

Q Okay. What did he tell you or what was being discussed between you and KP?

A I don't remember the exact conversation, but I do know that he was coming down here for that.

Q Okay.

A I can't tell you word-for-word what we said.

Q So you got the impression that's what was going to happen, correct? Was it from the conversation you had with KP?

A Yeah, that's what he was coming down here for.

Q So he told you that?

A Yes.

Q KP told you that?

A Yes.
Q And can you tell us why -- what the purpose was, why was Mr. Markham being targeted?
A So Kenzel wouldn't have no witnesses on his case.
Q And that's the sole reason, is that correct?
A Yes.
Q All right. Now, while Brockman was there, was present, was there any communications between him and KP regarding --
A KP wasn't here.
Q Okay. Was there any communications about what was going to happen?
A Between him and KP? I don't know.
Q Okay. No, as far as, I mean, you said Mr. Brockman was there, correct?
A Right.
Q And you stated that he was there because his -- the purpose of his presence is to commit to kill Mr. Markham, is that correct?
A Right.
Q So while you were there at, you said Drae's house, is that --
A His dad.
Q His dad's house, right?
A Right.
Q Was there discussions about plans for this murder, or

were you guys just -- was it just a social event?

A Wasn't no social event. It was basically -- well, like I said, I ain't have a conversation with him, but it was basically what he was there to do, like.

Q Did he make statements about what he was there to do?

A I ain't make conversation with him.

Q Well, did you hear any statements?

A No.

Q Okay. Were you in the same room with them?

A We were outside.

Q Okay. So you guys were outside, like on a porch?

A In the yard.

Q In the yard? And so you guys were --

A At that point, he was mainly talking to Drae and Tootie.

Q Drae and who?

A Tootie.

Q And do you remember what he was saying?

A No, I didn't make conversation with him.

Q Okay. But you weren't close enough to listen?

A No.

Q Now, was there -- at some point throughout the day, was there any discussions about what was to happen other than -- you already knew what was going to happen, correct, from your conversation with KP, right?

A Right.
Q So this potential murder was not discussed on that day?
A It wasn't -- me and Brockman didn't have a discussion about it, no.
Q Okay. Did Brockman have it with somebody else?
A Yeah, him and Drae and Tootie.
Q Now, did you hear that conversation between them?
A I heard it -- I only know what Drae told me.
Q What did Drae tell you?
A That he was -- what he was down here for.
Q Okay. And was this after the interaction was completed?
A No, this is before.
Q Okay. So you knew ahead of time what he was coming down here for, right?
A Correct.
Q So how long did this meeting last?
A It wasn't that long.
Q Okay. Were you guys drinking, was there --
A No.
Q -- marijuana being smoked?
A No.
Q Okay. And would you say it was 30 minutes?
A I don't even think it was that long.
Q Do you remember who called the meeting?

A No.

Q And how did you know you had to show up at this particular place and time?

A It wasn't a certain time. Drae just called and asked me where I was, I told him where I was, he told me to come out there.

Q Okay. Do you know why he felt the need to have you there?

A We was all one, so. I mean I was in on it just as well as they was.

Q All one as far as what? Were you part of a --

A Gang.

Q A gang? Yes.

A Yeah.

Q And what's the name of your gang?

A 4K.

Q Now, when that meeting -- I mean that meeting did occur in Alachua County, correct?

A Yes.

Q Okay. Now, was Brockman staying somewhere in Alachua County?

A I don't think he stayed that time.

Q Okay.

A No, I don't think he stayed that time.

Q Now, at some point, was there a second meeting that you

guys had?

A When you say you guys, who are you referring to?

Q I mean you -- it looked like there was a trip. Did you make a trip?

A When?

Q Downtown Gainesville. Was there another meeting, a trip -- it says title, second trip. Like downtown Gainesville with Brockman, Edwards, Neal and Robinson. Do you remember anything having to do anything like that in Ocala, Days Inn?

A You talking about two totally different situations though.

Q Okay. Okay. And well, can you tell me about that particular situation?

MR. OWEN: Let me object real quick. Do you mind rephrasing the question because I don't think I even understand.

MR. PIERRE-ANTOINE: No worries.

MR. JOHNSON: Hold it. I said I wasn't going to -- I am going to object when you ask more than one question at the same time because you have asked a question and then you ask another question, and I'm not sure which question she's answering. So I am going to object to multiple compound questions.

MR. PIERRE-ANTOINE: Okay, that's fine.

MR. JOHNSON: I'm just letting you know I'm not

trying to [indiscernible] your style, that might be your style, but I'm going to object on that basis.

MR. PIERRE-ANTOINE: That's fine.

BY MR. PIERRE-ANTOINE:

Q Was there a time that you, Brockman, and Robinson were on a trip in Ocala, a Days Inn? Does that sound familiar?

A Yeah.

Q Okay. Can you tell me what the purpose of that trip was?

A Purpose of that trip was -- wait, before or after? You got to tell me what you want to know about.

Q It was -- according to the report that I'm looking at, it says Brockman and Edwards and Neal and Robinson stop at Days Inn in Ocala, and it was not that far from the interstate.

A All right.

Q Do you remember that?

A Do I remember stopping there? Yeah.

Q And you guys stayed at -- you guys stayed at the hotel?

A No, not at that hotel. I never stayed at the hotel, neither one of them.

Q Okay. Can you tell me what happened that day?

A As far as what?

Q As far as were you there -- were you present there with these four people?

A Yes.

Q Okay.

MR. JOHNSON: Have you got a report you're referring to because I've got them, we can give it to her if that will help you.

MR. PIERRE-ANTOINE: Yeah.

MR. JOHNSON: I got them. Which one are you referring to?

MR. PIERRE-ANTOINE: I'm referring to the FBI report, page two of five.

MR. MILLER: What's the date of it?

MR. PIERRE-ANTOINE: It's March 25, 2021.

MR. JOHNSON: Okay. If you want, I'll hand that one down. I've got 10/29 with a ten pager, and I've got 10/21 which is a 23 pager. You're referring to how many pages?

MR. PIERRE-ANTOINE: Three of five.

MR. JOHNSON: What page are you on?

MR. PIERRE-ANTOINE: Two.

MR. JOHNSON: Is this the page?

MR. PIERRE-ANTOINE: Yeah.

MR. JOHNSON: What is the question?

BY MR. PIERRE-ANTOINE:

Q I asked her about that particular meeting at Days Inn, you were present there.

A Correct.

Q Can you tell me what, if anything, was being discussed during that particular incident?
A We had just came back from West Palm. That was our first stop at that hotel.
Q Okay. And can you tell us what the purpose -- so you were on your way to West Palm Beach, right?
A We just came back from West Palm Beach.
Q And can you tell us why you were going down to West Palm Beach?
A Yeah, to pick up KP and Tre.
Q Okay. And can you tell us what they were doing down there?
A What they were doing in West Palm?
Q Yeah.
A Living, I guess. I don't know what they were doing down there.
Q Okay. And you guys essentially went back to Alachua County. How long were you down there? How long were you down in West Palm Beach?
A Just long enough to pick them up, then we made a couple stops and came back. Wasn't down there that long at all.
Q So did you have any continued interaction with Brockman after that meeting?
A Yeah. I drove him to Gainesville.
Q Okay.

A I don't know if I drove or Jeffery drove. We was in the same car on the way to Gainesville.
Q So you were part of the party that brought him from West Palm Beach to Gainesville?
A Correct.
Q Can you tell us when that was, approximately?
A Datewise?
Q Yeah.
A I don't know the exact date. I know it was in -- I think it was in June.
Q And when you -- I'm assuming it was a long trip.
A Yes.
Q Was anything discussed on the way up here from that trip?
A I don't remember exactly.
Q Okay. Was the plot discussed? The plot meaning -- just to clarify so everybody can understand the same page. The plot to commit this murder, was that discussed?
A Not on the way up, no.
Q Okay. And where did you drop him off?
A The hotel on Williston Road.
Q And do you remember whether or not when you dropped him off, did he stay there by himself or did he have somebody from your group with him?
A Yeah, KP with him.

Q And anybody else?
A No.
Q Did you stay with them at the hotel or did you go on your way?
A No, I left. I ain't stay at the hotel.
Q Okay. Now, who did the driving?
A When?
Q The driving back from West Palm Beach when you brought Brockman over?
A Either me or JJ. I don't really remember which one. One of us, though.
Q Now, was it a rental car?
A No.
Q Whose car was it?
A My godbrother.
Q And what's your godbrother's name?
A Adarious.
Q So after you dropped him off at the hotel by Williston, you guys went home?
A I went to Drae house.
Q Okay. And was there any discussions at Drae's house about this pending murder?
A Not in particular that one. We was going out downtown Gainesville because it was a concert or something, I don't remember exactly what it was.

Q And so you guys went to party at this concert?
A We didn't go. We rode around Gainesville, downtown Gainesville.
Q Okay. Can you tell us the next opportunity when you guys -- when you were part of a meeting that was discussing this particular murder?
A I mean we was all in the car. KP and Brockman was in a car in front of us, we was in a car behind them, so I can't tell you what they talked about.
Q Okay. I'm just asking what you talked about. Were you part of any communication about this particular murder that's supposed to take place?
A Well, at that time, the murder wasn't for Quantrale. It just was for Jamari.
Q Okay. So how long -- how long were you guys -- at some point, that party ended, right?
A We never went into a party, we was just in the area.
Q Did you go -- once you finished driving, was there anything that happened when you were driving around?
A Yeah, we seen them, but when we circled back around, the police was right there, so.
Q And who did you see as far as them?
A The whole little 56 clique.
Q Was there anybody in particular that you were looking for that was there?

A I don't remember.

Q So the police were there, and then you guys left?

A Yeah.

Q And where did you guys go?

A Pretty sure I went back to Drae house. I can't tell you where they went at.

Q When was the next time you -- did you guys go out another time after that?

MR. JOHNSON: I'm sorry, the predicate for who you guys is?

BY MR. PIERRE-ANTOINE:

Q Did you participate where you and your other gang members went looking for individuals to kill?

A No, I wasn't with them.

Q Okay. Did you have any more interactions with McKenzly Edwards about having anybody else killed?

A Yeah.

Q Okay. Can you tell me what those interactions was like?

A They were in Alachua, I was in the shower in Gainesville at Drae house. He called my phone and --

MR. MILLER: Who he is?

A Drae called my phone. I mean not Drae, I'm sorry, McKenzly called my phone and I told Drae to answer it. Drae said they see Quantrale, what do you want them to do? I said go

ahead.

Q And where did they say they saw Quantrale?

A You say where did they see him at?

Q Yes.

A A house in his neighborhood.

Q Okay. And then he asked you -- why did he ask you what you want him to do?

A I don't know. He did it and I said go ahead, so.

Q So it sounds like he was asking permission.

A If that's what you want to call it.

Q Okay.

A We all think for ourself. Maybe he was asking for my input.

Q Okay. And his response was okay?

A He shut the shower door and -- I mean he shut the bathroom door and walked out. I was in the shower.

Q What I mean is McKenzly Edwards, you said he asked you what you want him to do?

A He asked Drae and Drae asked me.

Q Gotcha. Gotcha. So do you remember what happened after that conversation with regards to McKenzly Edwards?

A You said what happened?

Q Yes. Was there -- did you hear about what happened? Was there anything -- you said you were in the shower.

A Right.

Q And you said that he spotted this particular gentleman where he spotted that person at.

A Mm-hmm.

Q And he asked what --

MR. JOHNSON: Who is he?

MR. OWEN: You got to use names.

MR. JOHNSON: Who is he? We got too many he pronouns.

BY MR. PIERRE-ANTOINE:

Q Okay. You received a call from which person was spotted by McKenzly Edwards?

A I didn't receive the call. Drae answered the call.

Q Drae answered the call.

A Right.

Q Who did Drae identify that McKenzly Edwards said that McKenzly spotted?

A Quantrale.

Q Okay. So were you told what happened to Quantrale after McKenzly Edwards spotted him?

A Yeah. When I -- when I got out the shower, Drae told me that we was gonna be needing to leave, leaving soon.

Q So you and Drae left?

A Well no, I didn't leave with him right away. I left with his girlfriend and we took the kids to football practice. And then I met McKenzly -- I ain't a hundred percent sure if

Brockman was in the car, but I think Brockman was in the car, I think I met both of them at Wendy's.

Q Do you remember what's the name of the girlfriend?

A Deiondra Gray.

Q And you said you guys met at Wendy's. Can you tell me who met at Wendy's?

A Deiondra drove me to Wendy's to meet McKenzly and Tre.

Q And what was discussed between you, McKenzly and Tre?

A At that point, not too much. I was gonna meet Drae and JJ.

Q What was the purpose of that meeting?

A Switch cars.

Q Switch cars for what?

A So we could take them back to West Palm.

Q And did you take them back to West Palm?

A Yes.

Q Now, were you -- when the particular -- let me go back. So you drove them back to West Palm. Had he completed his intended purpose by then?

A Yes.

Q Now, tell me, how did you find --

MR. JOHNSON: Who is he? Is this Brockman?

MR. PIERRE-ANTOINE: Brockman.

MR. JOHNSON: Okay.

MR. PIERRE-ANTOINE: My apologies.

BY MR. PIERRE-ANTOINE:
Q So how did you become aware that Brockman had killed the intended target?
A Because he said, he said he won't be talking on Facebook no more.
Q Was that face-to-face?
A Yeah, we was in the car.
Q Okay. And who else was in the car when that statement was made?
A Me, KP, and JJ.
Q KP is McKenzly?
A Yes.
Q Do you remember what Brockman was paid to commit this act?
A I don't think he was paid to commit this one.
Q Can you tell me what made you say that?
A I don't think he was paid. He wasn't paid.
Q Nobody discussed a price?
A No, he got paid for the one before that and he ain't succeed, so he wasn't paid for this one.
Q Now, was McKenzly Edwards present when this killing occurred?
A Yeah.
Q And how do you know that?
A Because he told me they was in the car together.

MR. MILLER: Who told that you?
THE WITNESS: McKenzly told me he was in the car with Tre.
BY MR. PIERRE-ANTOINE:
Q And who else?
A McKenzly and Tre. KP and Tre.
Q McKenzly and Tre.
A Yeah.
Q Did anybody describe to you how the killing occurred?
A Yeah.
Q And who described to you how it was done?
A It was kind of both of them going back and forth. KP and Tre.
Q And what did they tell you?
A That when they first pulled up, KP kind of kept going and Tre fell, and then he got up, ran in the house after Quantrale, shot him in the face, ran back and they left.
Q Now, I just want to make certain that I understand. Did the shooting happen while in the vehicle?
A KP pulled up, Tre got out the car and he fell, and then he ran in the house and shot him.
Q All right. Did they tell you whether or not there was people around the shooting?
A Yeah, they told me that before they did it.
Q What did they tell you?

A That they see Quantrale with other people on the porch.
Q And after the shooting, what did they do?
A I don't know exactly what they did.
Q They didn't tell you?
A Like what you mean?
Q Did they go somewhere after the shooting?
MR. JOHNSON: Who is they?
MR. PIERRE-ANTOINE: Tre and McKenzly.
THE WITNESS: Yeah, they went -- I don't know exactly where they went at. They went -- I think they went to Ocala.
BY MR. PIERRE-ANTOINE:
Q Now, McKenzly and Tre were in the vehicle when this killing occurred, correct?
A Correct. Wait, in the vehicle when it occurred?
Q Well, they used a vehicle --
A I just told you how.
Q Well, they used a vehicle to get there.
A Right.
Q Do you remember what kind of vehicle was it? Was it a rental or did it belong to somebody?
A It belonged to Drae cousin. Drae and Elboric cousin.
MR. OWEN: You all right, Bill?
MR. MILLER: Yeah, I'm all right.
BY MR. PIERRE-ANTOINE:

Q Now, was McKenzly -- you indicated earlier, and I just want to make sure I understand this. There was a previous scheduled killing that was supposed to occur, and that wasn't done, correct?

A Correct.

Q And this was a makeup for that, is that right?

A Correct.

MR. PIERRE-ANTOINE: Okay. All right, Bill, you can go ahead and ask more questions.

BY MR. MILLER:

Q Rakeidra, my name is Bill Miller, I'm an attorney here in Gainesville, and I represent Mr. Brockman in this case. Okay? I'm going to ask you a few questions about what you know. If I ask you a question which is in any way unclear to you, I want you to let me know before you give me an answer so I can try to clear it up, okay? So like if I do what you've already heard, sometimes if I say he, and we all use pronouns and there's a lot of hes and shes in this thing, and if you don't know what I'm talking about, just ask me, okay, and I'll try to clear it up.

I'm not trying to trick you. I'm not trying to play games, I'm not trying to cross-examine you or anything else. I just want to know what you know about this particular case. If I ask you a question and the answer to that question is I don't know, as long as that's the truthful answer, that's the answer

you should give. If it's I don't remember, that's the answer you should give if it's the truth, but don't say I don't remember or I don't know if you do know, okay, because that would not be the truth. You understand, right?

Also try to answer out loud, and you've been doing a good job of that so far. I know you've given depositions before. Because this is being recorded on an audio recorder, we use that primitive method here today, and we don't want to have to try to debate whether you shook your head or nodded your head or something else and not know what your answer was, okay? So if I interrupt you from time to time and I say is that a yes, is that a no, it's not because I'm being rude, it's just so that I can have the record be real clear as to what your answers are, okay?

A Okay.

Q All right. Now, your date of birth is 8/23/90, right?

A Yeah.

Q In terms of -- and I ask this of every civilian witness that I depose. Your prior criminal history, have you ever been arrested before, ever in your life, juvenile or adult, anywhere in the country?

A Yes.

Q When was the first time you ever got in trouble? Let me make it easy on you. Were you a juvenile?

A No.

Q You were an adult? First time.

A Yeah.

Q Okay. I know that in 2018 you got arrested a number of times. Had you been arrested before that?

A Yes.

Q Okay. What was that for and where?

A Driving with suspended license in Alachua County. And I think I got arrested in Madison County.

Q Okay. Other than Madison County and Alachua County, is there any other state or county in the whole country that you've ever been arrested?

A No.

Q And when I say arrested, I mean just taken to a police station, put in, you know, not necessarily anything that stuck, okay?

A Just Madison.

Q Okay. What about Marion County?

A No.

Q In 2018, you were arrested for basically running the house, or being part owner of the house at 15604 Northwest 141st Street right?

A Correct.

Q Tell me how that came about.

A How I got arrested?

Q Yes, ma'am.

A I got picked up with Kenzel on charges. They came to my apartment in Gainesville and picked me up.
Q When you say they, who came?
A ASO.
Q ASO. So the Alachua County Sheriff's Office. Were you with Kenzel somewhere else or were you actually at the drug house?
A I was with him at my apartment.
Q At your apartment. And where was your apartment at that time?
A Gainesville.
Q And did you live in that apartment with anyone else?
A Kenzel from time to time, but no, it was mainly me.
Q And what is your relationship to Kenzel?
A Friend.
Q Friend. Okay. Have you ever had any kind of romantic relationship with Kenzel?
A No.
Q Is Kenzel older or younger than you?
A Younger.
Q Younger you said?
A Yeah.
Q Is he older or younger than his brother?
A Younger.
Q Now, McKenzly is who we know as KP, right?

A Correct.
Q Is KP also Kenny Poo Poo?
A Yeah.
Q Yvens asked you a lot of questions, but I'm going to jump ahead a little bit right now. Yvens asked you a lot of questions about some conversations you had and some meetings you had with my client, Mr. Brockman. Where was Kenzel at that time?
A What time?
Q At the time that you first met Hakiem Brockman.
A Incarcerated.
Q And where was he incarcerated?
A Alachua County.
Q And why was he incarcerated in the Alachua County jail?
A They charged him with attempted murder.
Q And attempted murder on whom?
A I don't remember exactly who it was on, honestly.
Q Let me try to help you a little bit. Was this before or after Big Country was shot?
A This was after Big Country was shot.
Q Did this involve a vehicle that was shot up with a number of people in it?
A Yeah.
Q Okay. Do you know any of the individuals who were in that vehicle?

A Do I know them personally?

Q Do you know who they were?

A I don't remember. I don't know exactly who was in the vehicle. I know the names that they list.

Q Who was that?

A Jazz.

Q Jazz? Who is Jazz?

A A girl from Alachua. I think her two kids was in the car.

Q Anybody else in the car?

A Not that I know of.

Q What is your understanding of why that car was targeted?

A That car wasn't targeted. It was really the yard that was targeted. The car was just in the yard.

Q The car was parked in whose property?

A That's where Cliff Snead lived at.

Q Pardon?

A That's where Cliff Snead lived at.

Q Cliff Snead?

A Yeah.

Q And what was the significance of Cliff Snead to Kenzel at that time?

A Like you mean are they related?

Q No. Why would anybody be interested in shooting up

Cliff Snead's yard?

A Oh, because we -- they said Kemarri was in the yard, the one that shot Big D.

Q When you say Kemarri, you're talking about Kemarri Hampton, right?

A Yeah.

Q And what is your understanding of why Kemarri Hampton was the target?

A Because he shot Big D.

Q Big D is also known as Big Country, right?

A Right, yeah.

Q And Kemarri was a juvenile?

A Right.

Q Kemarri was with someone when that happened, right?

A Yeah.

Q Who was that individual?

A I don't know who he was with.

Q Was that person also a target?

A I don't even know who he was with.

Q From the date that the shooting happened at the ball court, and I'm talking about the basketball court where Big Country was killed, were you present?

A I came up afterwards.

Q When you say you came up afterwards, did you come up so closely afterwards that you actually heard the shots?

A No, he was already shot by the time I got a call.
Q Okay. What was your understanding of how that shooting happened and why Big Country was shot?
A All I know is Kenzel called my phone and said get to the house, Big Country just got hit.
Q When you got there, did he explain to you how the shooting went down?
A When I got there, I went to the house, he wasn't at the house, so I cleaned up all the drugs in the house and he told me he was at the park, so.
Q Where is the house in relation to the park?
A Across the street. Like diagonally across the street.
Q Is this the same house that you were arrested for being a part of? 15604 Northwest 141st Street?
A Yeah.
Q And why did you make the decision to clean the drugs from the house?
A First instinct. I still can't answer that question to that day. That was just my first instinct.
Q How much drugs were in the house?
A I don't know off the top of my head.
Q Where did you put them?
A Put them in the car.
Q Whose car?
A It was a rental car.

Q Is it a rental car in your name?
A No, it was in Deiondra's name.
Q Is that Deiondra Gray?
A Yeah.
Q Let's talk about who lived at that house, 15604 Northwest 141st Street. Was there a full time resident of that house?
A I mean we all paid the bills there.
Q That's not what I asked. Did anybody live there kind of permanently?
A Yeah.
Q Who?
A JJ, KP, and Kenzel.
Q JJ, KP, and Kenzel?
A Yeah. I mean they all had rooms there, if that help you any.
Q Did they have rooms elsewhere as well, though?
A Not that I know of.
Q Did you have a room there?
A No.
Q Whose name was the house in?
A Mine.
Q Yours?
A Yeah.
Q The drugs that you removed from that house, what did

they include? And I'm talking about what types of substances.

A Weed, cocaine, crack.

Q What about opioids?

A I don't remember.

Q Opioids were sold from that house before.

A I used to sell them.

Q The weed, cocaine, crack, and opioids that were in that house, who did they belong to?

A It was some of everybody drugs. I just cleaned up what I know where it was kept at.

Q At that time, when that was going on, how were you guys receiving drugs?

A I was getting my drugs from Drae.

Q What about KP and Kenzel?

A Kenzel weren't really selling drugs like that. When he did get it, he either got it from me or Drae.

Q What about KP?

A Drae. Mainly everybody got it from Drae.

Q Now, did anybody else use that house?

A To sell drugs?

Q Mm-hmm. Elboric never did? JJ never did?

A I said JJ.

Q Okay. Where did JJ get his drugs?

A Drae.

Q Now, I had read in some of your statements that there

was fairly large quantity of drugs moving in and out of that house.

A Correct.

Q Drae was bringing all that -- all those drugs to that house?

A That's who I got it from.

Q Do you know where he was getting his?

A I mean no, I don't know them people.

Q Let's talk a little bit about the structure of 4K.

A Uh-huh.

Q When was that -- we'll call it a gang for now. When was that gang formed?

A It wasn't never really formed. We all just --

Q Approximately when did it go from being a bunch of people hanging out to being a drug operation? Let me ask you that.

A I mean I started selling drugs in 2016, so.

Q Okay. And how old were you then?

A 26.

Q And how is it that you got involved in that?

A Just wanted to make some money.

Q Were you under the tutelage of someone else? In other words, did someone else, like, introduce you to that and say here's a good way to make money?

A No, I been in Alachua all my life. That's just what go

on though.

Q So in 2016, you started selling drugs?

A Yeah.

Q How did you start this association with these other individuals?

A Drae my cousin.

Q Drae is your cousin.

A And I mean we all grew up in the same neighborhood. We all from Alachua. Alachua ain't that big.

Q Where does the name 4K come from?

A Elboric's music label.

Q Pardon?

A Elboric's music label.

Q Elboric's music label? Do you know why he called it 4K?

A The street, 134th Street.

Q In terms of the structure of the gang, once it got going, who was in charge?

A It was never like that. Ain't nobody wasn't never really in charge of nobody.

Q Who, in terms of -- who would you say were the principal members then?

A We was all one, like.

Q Okay. But let me -- because I know times when you give statements, you refer to people as being kind of part of 4K but

not really and stuff like that. So that's kind of what I'm trying to figure out here, right?

A Mm-hmm.

Q So you would consider yourself?

A Mm-hmm.

Q Elboric?

A Correct.

Q JJ?

A Correct.

Q KP?

A Correct.

Q Kenzel?

A Correct.

Q Drae?

A Correct.

Q All equals?

A All equal.

Q Who am I missing?

A Tootie.

Q Tootie? What about Deiondra?

A No.

Q Okay. You said that quickly. Deiondra didn't have anything to do with it, is that what you're saying?

A She just Drae baby mama. She ain't in no gang.

Q Anybody else?

A I mean Sham affiliate herself with us, but she wasn't really, like, selling no drugs with us or nothing like that, so no, not really.

Q And who is that you said? Sham?

A Sham, yeah.

Q How do you spell that?

A S-H-A-M.

Q Who is Sham?

A That's Tootie's sister.

Q Tootie's sister, okay.

A I mean I feel like she just grew up on the same street as them, but she ain't really -- she wasn't selling no drugs like that.

Q Had you been made aware, prior to your arrest in 2018, that -- I mean was there word on the street kind of that law enforcement was kind of closing in on you guys?

A No.

Q Or was it a total shock to you?

A It was a shock.

Q And then in terms of your arrest, the house was searched on January 16th of 2018, right?

A Mm-hmm.

Q What was the day that Big Country was killed?

A January 14th.

Q So two days later, they're raiding your house?

A Right.

Q The same house that you moved the drugs from?

A Right.

Q When they searched the house, they found things that they arrested you for. Was that stuff that you had put back, or was that stuff that you had left behind and missed when you moved the drugs?

A Stuffed that got left behind.

Q So there was a lot more stuff in that house if they got there two days earlier, right?

A Right.

Q Did you also move cash?

A I can't tell you what was inside that safe.

Q You moved the safe?

A Yeah.

Q Is that a safe where typically the cash that you made from your drug sales was put?

A That was Drae's safe.

Q Drae's safe?

A So I don't know what was in there.

Q How was the cash that was generated from the drug sales typically distributed among the group?

A I made my own money. I kept my own money.

Q So if you sold, you got whatever you sold, right?

A Right.

Q Where did you keep your money?
A At my house.
Q When you say your house, is that the house in Gainesville that we talked about before?
A Yeah.
Q Is that an apartment or a house?
A Apartment.
Q How much weekly were you making approximately from your drug dealing at that time?
A I don't know. A lot.
Q Give me a ballpark.
A Like profit?
Q Mm-hmm.
A Probably like anywhere between 1,500 and like 3,000.
Q A week?
A Yeah.
Q And how much were you paying for your drugs weekly, for your stock so that you could sell from Drae?
A He was charging me, like, like sometimes 1,100.
Q So on a good week, you would have sold about $4,100 worth of drugs, cleared three grand?
A Yeah.
Q Sound about right?
A Yeah.
Q And what was the primary drug that you sold?

A Cocaine.
Q You already indicated you also on occasion sold opioids.
A Yeah.
Q Where did you get those?
A Different people. Like I meet people at the club telling me they sell it. Wasn't no one person. It was always hard to come by.
Q Did you also sell weed?
A No, I smoke too much of it.
Q At the time all this was going on, would you call yourself a daily user of weed?
A Yeah.
Q Were you high most of the time?
A Yeah.
Q Were you also using cocaine at the time?
A Never.
MR. OWEN: I'm sorry, did you say never?
THE WITNESS: Yeah, never.
BY MR. MILLER:
Q What about any other substance that affects you? And I'm including alcohol in that.
A I ain't really no drinker.
Q Okay. Anything else? Molly?
A No. I tried it, but no.

Q So your drug of choice is marijuana?
A Correct.
Q Do you currently have a card for legally using it?
A I'm on federal probation, I can't use it.
Q I figured that was probably an impediment to getting a card.
A Federal don't accept the card.
Q Okay. So first let's go back to your arrest in 2018 on the possession of a structure where drugs are sold or trafficked. You ended up going to court on that case and entering a plea of guilty, right?
A Correct.
Q You did that pursuant to a plea agreement, right?
A Correct.
Q What was that plea agreement?
A That was in 2019 when I got sentenced. It was two cases on that. I think both of them was together.
Q Right. I'm starting first with when you got -- okay, because that's right, you picked up the possession of marijuana, the tampering with evidence, and the possession of a controlled substance around that same time, right?
A Right.
Q How did you get that arrest?
A I was at Tootie house, and they kicked in Tootie door.
Q They kicked in Tootie's door?

A Yeah, I was outside.
Q How long after your arrest on the other charge was that?
A That was in July, I think.
Q So you were out on bond awaiting going to court on your earlier arrest when that arrest happened, right?
A Right.
Q And those three charges, were those drugs that you had on your person?
A Correct.
Q Okay. And who represented you on those two cases?
A Then?
Q Yes, ma'am. Yeah, I'm not talking about the VOP, I'm talking about before you got on probation.
A I don't even know. I had a public defender, I don't even remember his name.
Q Well, there was a conflict on one case, right, so you ended up with one of the conflict lawyers?
A Oh, Michael Ruppert.
Q Michael Ruppert, okay. And what was your understanding of the plea agreement that you entered into on those four charges?
A Suspended sentence. I had a year house arrest followed by two years of drug offense probation. Community control.
Q At that time, had anyone approached you -- and when I

say anyone I mean anyone, civilian, cop, state attorney, lawyer -- anybody approached you about interest in the other members of 4K?

A I mean I got questioned when I got picked up with Kenzel.

Q Okay. You're talking about on the original arrest for having the drug house?

A Yeah, but they ain't question me about that. They questioned me about the shooting.

Q Okay. And would that have been the law enforcement officers that placed you under arrest?

A No, it was State Attorney Lloyd and I think one of the officers was there.

Q Okay. Darry Lloyd is the investigator at the State Attorney's Office, right?

A I don't know.

Q And when they questioned you, was that on the record?

A I don't remember. It was in the office. I was in --

Q You were in the office? Was it your understanding it was being recorded?

A I don't remember. I think so, but I ain't a hundred percent sure.

MR. MILLER: Do you know if there's a recording of this, Dan?

MR. OWEN: I'm not aware.

THE WITNESS: It's when I got arrested.
MR. MILLER: Can you check?
MR. OWEN: I will check. I believe you're talking about maybe Glenn Bryan. I'll check on it.
MR. MILLER: All right.
THE WITNESS: Yeah, I think that's who it was.
MR. MILLER: Glenn Bryan?
THE WITNESS: Yeah.
MR. MILLER: Glenn wasn't in Levy at the time?
MR. OWEN: I'm not positive. It's been so long.
MR. EDWARDS: Glenn's been there in Levy for a long time.
BY MR. MILLER:
Q Anyway, so you were questioned about the shooting.
A Mm-hmm.
Q Was that the shooting of Big Country or was that the shooting of the car later in the yard?
A The shooting of the car.
Q Shooting of the car. At the time that shooting took place, where were you?
A Deiondra's dad's house.
Q Whose guns were used in that shooting?
A Ours.
Q Tell me what guns you had, and by you it's the same way you said ours. Anybody who was involved in your group.

A I had a .38.
Q Who else? What other guns were there that you had access to?
A It was two .38s and an AK.
Q And an AR, right?
A I mean AR. Not AK, AR.
Q Well, there were both, weren't there?
A Not in that shooting.
Q Not in that shooting, but they were both in the house?
A We had an AK and an AR, yeah.
Q Okay. What about a .40?
A At that time? No.
Q Not at that time, later, was it KP who bragged about getting a new .40?
A Yeah.
Q Okay. The .38 that you usually carried, what did it look like?
A It was actually Drae gun, but it was -- it had like a -- sometimes I --
Q Let me interrupt you for a second. When you say it was Drae's gun, do you mean Drae is the person who purchased it?
A That's who I would get it from.
Q Okay. But didn't you carry that gun all the time?
A Yeah, but it was his gun.
Q Didn't he have his own gun that he carried all the

time?

A No, he ain't really carry a gun all the time.

Q But you did?

A Yeah. I either had -- if I had that gun -- if I ain't had that gun, I have his girlfriend's gun.

Q What was his girlfriend's gun?

A A black .38.

Q The .38 that was Drae's gun that you usually carried, what color was it?

A Green.

Q Green? And when you saw it was green, was it green metal or was it, like, a green handle with gray metal? Like what color was the barrel of the gun?

A Green.

Q Green. How many times have you fired that gun?

A I shot it -- I shot it -- I used it one time to shoot. I mean I emptied it, so I guess --

Q Where was that?

A In Alachua.

Q What was that about?

A When KP, KP fought Woody and Devin Hathcock, and I seen Devin Hathcock pull out a gun and point it at Drae like he was about the shoot Drae.

Q And it's your testimony here that's the only time you ever fired that gun?

A Yeah.

Q After you got put on community control followed by probation, you violated your probation?

A The first time, yeah, I was incarcerated when I used somebody else PIN number to call home.

Q Mm-hmm. And that case ultimately got dropped.

A Mm-hmm.

Q Is that a yes?

A Yes.

Q Were you questioned by law enforcement after you were first suspected of using someone else's ID to make a call from the jail?

A Yeah, but I don't know his name.

Q Was it Detective Lynch at the jail?

A Yeah, I think that's his name. I don't remember his name, but I told him I ain't want to talk to him.

Q Were you later questioned again by any other law enforcement, state attorney, lawyer, or anybody else?

A After I got out of jail?

Q No. First while you were in jail, after making those calls.

A When I made the calls to Drae?

Q Yes, ma'am.

A Or to his girlfriend? I had spoke with my attorney about some different things that it was gonna be supposed, so he

asked me some questions about him.
Q During those phone calls, there was a reference to them wanting to get information about a certain individual.
A About Drae.
Q Drae was that individual?
A Yeah.
Q Is that why you were calling Drae?
A I called his girlfriend, told her.
Q Okay. You called his girlfriend to tell her to warn him --
A Yeah.
Q -- that law enforcement was on to him?
A Yeah.
Q Did you give a recorded statement about those phone calls to law enforcement?
A Did I give it to them?
Q Yes, ma'am.
A I'm pretty sure they had it.
Q The calls themselves I'm not talking about, the calls are recorded, sure. My question is did they then come question you and say hey, you're calling this guy Drae, tell me about Drae and tell me what his involvement is and this other 4K activity.
A No.
Q No? Okay. After you got arrested for your violation

of probation, did anybody come to you and say they wanted to get information from you about the activities involved in these shootings around Alachua?

A No.

Q Okay.

MR. JOHNSON: You're talking about at the jail?

MR. MILLER: I'm talking about anywhere.

THE WITNESS: Oh, I thought you was talking about at the jail. No, nobody questioned me at the jail.

BY MR. MILLER:

Q I'm talking about while you have a violation of probation pending, okay? And let me break it down because there was more than one violation of probation.

A Correct.

Q So let's break it down. The first violation of probation is when you made the phone calls from the jail.

A Right.

Q Between that time and the time that you were aware that the feds were looking at you, okay, so after the phone calls, before you were aware the feds were interested in you, did you speak with law enforcement or anybody else, in custody or out of custody, about activities of 4K?

A This is before the feds picked me up or after?

Q Yes, ma'am.

A Before the feds picked me up?

Q Yes, ma'am.
A No.
Q Okay. There comes a time that you are the subject of a federal indictment.
A Correct.
Q Prior to that indictment, did you have information that led you to believe you were going to be indicted?
A No, I honestly didn't think I would get indicted.
Q But you were aware that there was an investigation?
A When they picked Drae and Boric and all them up, yeah.
Q Okay. So when you first became aware that the feds were interested in the activities of 4K was when?
A I never thought it was the feds. We always just thought that it was ASO.
Q Okay. Well, tell me how you became aware that something was going on?
A Oh, we seen Francis like everywhere we turned around and looked.
Q Saw what now?
A Francis, Officer Jayson Francis.
Q Okay.
A We always seen him in the rearview.
Q And who is he or she? Is not sure which.
A He worked for the feds, right?
MR. JOHNSON: His name's on some of these reports.

It's all right, didn't mean to help.

MR. MILLER: I'll question you later Mr. Johnson.

MR. JOHNSON: I'm ready.

BY MR. MILLER:

Q So it was your understanding that Francis was a member of the FBI?

A Yes.

Q Did you know that at the time you started noticing that he was "everywhere?"

A I mean we thought he was, yeah.

MR. JOHNSON: Know was the question. Did you know it?

THE WITNESS: Not for a fact, no.

BY MR. MILLER:

Q You said before you thought it was ASO.

A Yeah, we thought it was ASO.

Q You thought Francis was ASO at first?

A Yeah.

Q Okay.

A I didn't know nothing about the feds until the feds came and picked Drae up in the car with me.

Q That's what I was asking, okay? So let's back up a little bit. This individual you see is kind of following you.

A I mean and his kids played -- they practiced at the same soccer field that Drae daughter practices at.

Q You mean Francis' kids?

A Yeah.

Q You believed he was ASO. How is it you knew he was law enforcement at all? I assume he was not in uniform.

A He wasn't, but I guess his movements, like, you can tell.

Q Did he drive a Crown Vic?

A No, he drove a brown truck.

MR. OWEN: Can I jump in real quick? You're probably aware, but I just don't want there to be any confusion. I don't know if it's called being dually sworn, but Francis is both with ASO and the FBI.

MR. MILLER: I wasn't sure he was one of those.

MR. OWEN: Yeah.

MR. MILLER: Which has caused me enormous frustration at setting depos in the past.

BY MR. MILLER:

Q So you knew who this individual was, and you kept seeing him, right?

A When I was with Drae I seen him, yeah.

Q Did you communicate to other people hey, this dude keeps showing up, what's going on?

A Yeah, I mean there was conversation between me, Drae, Deiondra, like we just was conversating about it. He just riding by Drae house almost every day.

Q Did you alter the behaviors of 4K as a result?
A At that time, there wasn't nobody out but me, Elboric, Tootie, and Drae, so.
Q What's Tootie's real name again?
A Lorenza.
Q Lorenza Durr?
A Yeah.
Q So clear something up for me. Is it Lorenzo or Lorenza?
A Lorenzo.
Q Everybody else is in custody, right?
A Right.
Q So my question still remains, when you were aware that this guy was following you guys around, whoever remained out of custody, did you try to hide cash, did you try to hide drugs, did you try to change your behavior?
A We just moved a little smarter. But at that time, I wasn't really selling drugs like that, but when I was -- when I was selling, yeah, just moved a little smarter because I know he had his eyes on me.
Q Explain that to me because I read that before, you're not really selling drugs but you were. Are you just saying you were selling a smaller quantity?
A Yeah. I was working more.
Q Where were you working?

A Circle K.
Q Had you curtailed your activities a little bit because you felt the heat of law enforcement?
A No, not really. Honestly, I took that loss of Big Country hard. At that point, I knew I had to change my life. But I was still selling drugs until I slowed down, and then when I got on probation, I stopped.
Q You mean federal probation?
A No.
Q State probation?
A Right.
Q So it's your testimony from the time you were placed on state probation in 2019, from that day forward, you never sold another drug?
A If I did, I was selling it for Drae. But as far as me buying my own drugs to sell drugs to make my own money, no, I stopped. I was on community control, they could come search my house at any given moment.
Q You were still hanging out with Drae?
A Yeah, they'll come to the house. I couldn't go nowhere.
Q Well, you could eventually because you actually moved to have your community control turned into probation, and it was granted, right?
A Right. And then I started moving around --

Q You wrote the judge a letter saying how you weren't doing anything illegal anymore, right?

A Right.

Q And it was shortly after that that you got searched and busted again, right? That's when the feds busted you?

A Yeah, I ain't have nothing on me, though.

Q Describe for me the arrest as it happened from the feds.

A With me?

Q Yes, ma'am.

A They came in the Waffle House and --

Q You said the Waffle House?

A Yeah. I was at work.

Q You were working at the Waffle House at that time?

A Correct.

MR. JOHNSON: No, wait a minute. You had two jobs, right?

THE WITNESS: Yeah, the Waffle House and Circle K.

MR. JOHNSON: I don't want to mislead you that they were subsequent. They were going on at the same time.

BY MR. MILLER:

Q Okay. Came in the Waffle House. Go ahead.

A One of the servers say y'all can have a seat anywhere y'all like. They say we ain't here to eat, Rocky, I need you to come with us.

Q And who was that?
A Only face sticking out to me is Chalker.
Q Is who?
A Officer Chalker. I couldn't tell you who the rest of them was.
Q Were they FBI agents?
A Right, but he was APD. But they called there before, I ain't know it was them. They called and asked was I at work, and one of them gave me the phone and they ain't say nothing. But I don't know, I kind of felt --
Q All right. And when they took you into custody, they put cuffs on you?
A Yeah.
Q Okay. Put you in the back of a car?
A In front.
Q Front? Was it an unmarked car?
A SUV. I mean a truck.
Q Truck?
A Yeah.
Q Was it the same brown truck you were talking about before?
A No.
Q Okay. Where did that truck go?
A It took me to the federal courthouse.
Q The federal courthouse.

A Yeah.
Q Okay. And when you got to the federal courthouse, what did they do with you?
A Put me in a holding cell until I was able to talk to Huntley.
Q Did they try to question you before you were able to call a lawyer?
A No.
Q Now, Mr. Johnson is someone you retained, right? You didn't get a public defender and then have it go on a wheel or something like that?
A I retained him in my state case, he was appointed to me on my federal case.
Q Gotcha. Did you make any calls to anyone else from federal custody?
A My first call was my godson mama and then my mom.
Q Did you talk about what had happened at all?
A I just told them -- my mom had already knew, my coworker called my mom about it, she told her that they picked me up and that they said that I ain't going nowhere right now.
Q Did you tell anybody to do anything with anything that might be evidence or anything like that?
A No, I told my godson mom to get my money out my bank account, but that was it. But that was working money.
Q How much money was in that account at that time?

A About $1,100.
Q How much?
A $1,100. I think, don't quote me on it. Might have been a little less.
Q What was your understanding of your exposure? Do you know what I mean by exposure? How much time you could possibly get for the charges that you were picked up on?
A A lot is all I remember.
Q Pardon?
A Over 20 years. A lot of time.
Q Was it your understanding that there were any minimum sentences involved in what you were picked up for?
A Yeah, but I don't remember what it was.
Q Was it your understanding that there were guidelines involved in what you were facing?
A Sentencing guideline?
Q Yes, ma'am.
A Yeah.
Q What was your understanding of what a guideline sentence would look like if you pled guilty or were convicted of these charges?
A I don't remember.
Q You don't remember?
A No.
Q Ballpark.

A How much time I get if I was convicted?
Q Yes, ma'am.
A I know it was over 20 years.
Q And what was your understanding of the best way to avoid getting over 20 years in prison under the federal rules?
A What you mean?
Q Well, I'm sure that you wanted to avoid getting greater than 20 years, right?
A Right.
Q And subsequently, was it your understanding that by cooperating, that might reduce that sentence the way the federal system works?
A Yeah.
Q As we sit here today, have you been sentenced on your federal case?
A Yeah.
Q What was that sentence?
A Time served followed by 15 -- I mean followed by five years' probation.
Q So you're not awaiting reporting to a federal prison right now. You don't have to go to prison?
A No, I did 15 months.
Q And where did you do the 15 months?
A Some in Dixie County, some in Levy County.
MR. JOHNSON: Pre-dispo.

MR. MILLER: I'm getting there.

MR. EDWARDS: Tom wants to testify. Put him under oath.

BY MR. MILLER:

Q Dixie County and Levy County, were those county jails or were those prisons?

A County jail.

Q At the time prior to your getting probation on the federal case, did you also have a violation of probation pending for the things that you were on probation for in state court?

A Yeah.

Q What was your understanding of the maximum you could have received for the offenses for which you were on probation in state court?

A I don't remember.

Q Well, you were on probation for running a drug house. What was the maximum for that offense as far as you know?

A I don't remember.

Q Was it more than ten years in prison?

A I don't remember.

Q So you entered a plea without having any idea how much time you could have gotten for it?

A I mean you talking about something that happened like, like it just happened yesterday.

Q I'm not acting like it just happened yesterday, but it

was a fairly important time in your life, wasn't it?
A Yeah.
Q You were also on probation for tampering with evidence?
A Yeah.
Q What was your understanding of how much you could get for that?
A I don't remember the number.
Q What about for possession of a controlled substance?
A I don't remember the number.
Q You were aware that possession of a controlled substance, tampering, and running a drug house were all felonies?
A Right.
Q So at an absolute minimum, you're looking at a maximum of 15 years, right?
A I don't remember.
Q Maybe 25? In 2020, you got arrested for driving while suspended, right?
A Yeah.
Q What happened with that case?
A I pled guilty it to. I think I pled guilty to it. I don't know.
Q Did you plead guilty to it or was it dropped?
A It wasn't dropped.
Q You were guilty of it, right?

A Yeah, I was driving with a suspended license.
Q And you were on probation at the time?
A Right.
Q Did they violate your probation at the time?
A They did.
Q Okay. Was it a felony or misdemeanor driving with license suspended? I'm just talking about 2020. I know you had other driving while suspendeds way before that.
A I think it started as a felony.
Q Okay. And at that time, were the federal charges pending?
A No.
Q They came after?
A Yeah.
Q So you had the federal charges that violated your probation, right?
A Right.
Q And you had the driving while suspended that violated your probation?
A They released me on that [indiscernible]. They released me.
Q I understand that. But you had the driving while suspended that violated your probation, right?
A Yeah.
Q And you had the four fraudulently using someone else's

ID pending, right?

A Yeah.

Q That violated your probation. You also had a 2018 battery charge that was dropped, but that was, I think, before you were put on probation, right?

A Yeah. That ain't even go through the courts, though.

Q And when you went to state court on the violation of probation, you received what sentence?

A On which violation of probation?

Q The last one. The last time you went to court on a violation of probation in state court.

A Oh, I had to do -- they added another year to my probation.

Q Does that run consecutive or concurrent with your federal probation?

A Concurrent.

Q And in addition to whatever consideration you got and whatever sentences you got with respect to these cases, you also received transactional immunity for any discussion that you had about your actions as a member of the 4K gang, including your involvement in the planning and execution of any of these shootings?

A Correct.

Q Okay. In terms of -- I'm going to jump ahead a little bit. I'm going to talk about -- I'm not really jumping ahead in

time, but jumping to a different topic. I'm going to revisit some of the things that Yvens just talked to you about, your conversations with my client, Hakiem Brockman.

A Okay.

Q Prior to going to Palm Beach, you had no familiarity with Hakiem Brockman, is that a fair statement?

A I had seen him.

Q Where had you seen him before?

A Drae daddy house.

Q Pardon?

A At Drae daddy house.

Q At Drae's daddy's house. When was that?

A I don't remember the exact date.

Q What's that now?

A I don't remember the exact date.

Q The exact date. How far before there was discussion -- let me ask you this. Is the date that we're talking about where you first saw Hakiem at Drae's daddy's house, was that before Big Country was shot?

A No.

Q Okay.

MR. JOHNSON: I'm sorry, Mr. Miller, I'm going to have to ask you, what do you mean by familiarity? Are you talking about actually seeing him or are you talking about knowing if he was on the planet when you say familiarity?

MR. MILLER: I'm saying encounter.

MR. JOHNSON: Okay, thank you.

BY MR. MILLER:

Q So when you saw him the first time at Drae's daddy's house, did you know anything about him?

A I just knew he was from down there, from West Palm.

Q And did you know how anybody that was in Alachua was aware of Hakiem Brockman?

A Say that again?

Q How is it that anybody in your circle of friends, let's just limit it to 4K, how is it that any of them knew Hakiem Brockman?

A KP.

Q Did KP grow up in Palm Beach County or did he just go to Palm Beach County after he sensed the heat from the shooting in Alachua?

A I don't know if he grew up there or not, but I know he went there.

Q Okay. Was it your understanding he was going there because he knew people were looking for him here?

A Yeah.

Q Do you know anything about the circumstances under which KP was arrested in Palm Beach County?

A No.

Q Have you ever spoken with Kenzel from the jail since

he's been arrested?

A Yeah.

Q Have you ever spoken with KP from the jail since he's been arrested?

A Yeah.

Q What was your understanding, if you had any at all, of what the relationship was between KP and Hakiem Brockman?

A Friends, I guess.

Q Was it your understanding they were friends who knew each other prior to KP going to Palm Beach County or was it your understanding that Hakiem was somebody who KP met after he got to Palm Beach County?

A I don't know. I don't know if they was friends before. I don't know when they became friends.

Q So you have no idea when they met, right?

A Right.

Q You had described to Mr. Pierre-Antoine a conversation wherein you heard Hakiem Brockman say he won't be talking on Facebook anymore.

A Right.

Q Other than that conversation, what direct words have you heard from Hakiem Brockman about his involvement in this case, any of these cases?

MR. JOHNSON: Do you need to talk to me?

THE WITNESS: Yeah.

MR. JOHNSON: I need a break myself. Can we take about four or five minutes?

MR. MILLER: What is the -- I'm a little concerned about -- are you concerned you're getting in an area that might not be protected?

THE WITNESS: No, I ain't worried about that.

MR. MILLER: Well I'm wondering why we need the --

MR. JOHNSON: I guess she wants to talk to her lawyer. If you're going to object to that, that's up to you.

MR. MILLER: I think you should answer the question. I don't think I've asked anything that would merit there being any consultation with anybody about the question that I asked.

THE WITNESS: All right. Ask the question again.

MR. MILLER: Okay.

BY MR. MILLER:

Q Other than the conversation that we talked about?

A Which conversation?

Q That was the conversation where you said he had said -- he had made the comment he won't be talking on Facebook anymore.

A Right.

Q I just want to know if there's any other conversations or anything you overheard that Hakiem Brockman said directly out of his mouth about his involvement in any of these cases.

A I mean we had conversations. He came down here multiple times, so like.

Q But I'm talking specifically about his own actions, okay? Because sometimes it's hard for me, as a lawyer, to pull apart when you're relating things that you learned, whether you learned those things from Drae, whether you learned those things from KP.

A So which time are you talking about?

MR. OWEN: I'm going to object real quick just because when you say any of these shootings, that's too vague, number one. If you want to take each of the charged shootings and ask the April -- the January shooting of Dana Walker, if you want to talk about the retaliation shooting right after that, if you want to talk about the April shooting, and then the ultimate June murder of Quantrale, then there was an October shooting, and then December shooting. If you want to take them one by one and ask, but just saying these shootings, it's too vague.

MR. MILLER: I think -- I'm asking a question, I think I can make it much more simply.

BY MR. MILLER:

Q Has Hakiem Brockman ever told you he shot anybody?

A He told me he shot Quantrale in the face.

Q Okay. He told you that?

A He said it in the car. Yeah, me, him, and JJ was

talking. All of us was talking, he said that.

Q Explain the circumstances of that to me.

A He said he won't be talking on Facebook no more.

Q Okay.

MR. JOHNSON: Well, Mr. Miller, when you say the circumstances, I think if you laid the predicate as to which trip where, driving from Gainesville to Palm Beach, from Palm Beach to Gainesville, you might have more direct answers.

MR. MILLER: Okay.

BY MR. MILLER:

Q I think that your answers to Mr. Pierre-Antoine, you had already indicated that in the trips to Palm Beach and back from Palm Peach, there wasn't any discussion about this, right?

A When?

MR. JOHNSON: No, that's misrepresenting her response.

BY MR. MILLER:

Q When you first encountered Mr. Brockman in Palm Beach County and you rode with him back to, I think first Marion County and then ultimately to Alachua County?

A Correct.

Q There was no discussion about shooting, or planning, or plotting, or anything else about what was going to happen, is that a fair statement?

A I mean we knew what they was coming up there for, but.

Q That's not what I asked you. Mr. Brockman and KP, or anyone else in the car, didn't discuss specific actions that were to be taking place on that trip. Unless I misunderstood what you said to Mr. Pierre-Antoine, that was my understanding of what you said. That you didn't hear --

MR. JOHNSON: That trip.

MR. MILLER: I'm saying that trip.

BY MR. MILLER:

Q It's my understanding you didn't have any conversations, or at least you didn't hear them, about what was being plotted, what was going to happen, who was going to take what action, or anything along those lines, fair?

A I'm confused now.

MR. JOHNSON: Mr. Miller, you're asking her specifically about the drive from West Palm to Marion or from Marion to West Palm?

MR. MILLER: Okay. I think I made it --

MR. JOHNSON: How many different trips were there? There was more than one trip. There was more than one trip.

MR. MILLER: I know, and I think I made it about as clear as I can. I specifically limited it to the first trip.

BY MR. MILLER:

Q When you went down to Palm Beach County and you rode

back to Marion County and then to Alachua County. All one trip, all one day.

A On the road to Marion County, you asked me was we talking about killing people?

Q Yes, ma'am.

A No.

Q And if I understood you correctly, when Mr. Pierre-Antoine was asking about that trip, you didn't hear any discussion about plotting a shooting or anything along those lines?

A From Palm Beach to the hotel?

Q From Palm Beach to the hotel, and let me make it clear.

A Because that's what he said.

Q Hold on. Let me make it clear. From the hotel first in Marion and then from Marion to Alachua, because there's actually two little trips there, right?

A Well, that's what I was trying to figure out.

Q I'm asking about both. So in neither of those trips was there a discussion about what actions were going to be taking place, correct?

A Yeah.

MR. JOHNSON: Now, I would like to take a break, and I have three reasons and I don't feel like explaining two of them, but one of them is I need to go to the mens room. So when you get to a point where you feel --

MR. MILLER: Taking a break right now is fine. It's fine.

MR. JOHNSON: Okay.

(Brief recess.)

BY MR. MILLER:

Q So Rakeidra, we talked about that one trip from -- and it's kind of two trips in one. One was to Marion County from Palm Beach County, the other was from Marion County to Alachua County, right? Okay. And we covered that.

How many other times after that were you ever, first of all, in a car with Hakiem Brockman?

A How many times after that?

Q Yes, ma'am.

A Three.

Q The very next time you're in a car, when is it?

A I don't remember the exact date.

Q No, I don't mean the exact date, I just mean circumstances.

A The next time -- the next time he came down was a blank trip.

Q What do you mean by that?

A He didn't -- like, he had to go back because his mama house got shot up, so he ain't do nothing.

Q During that trip, the blank trip, we'll call it the blank trip, okay, did Hakiem Brockman have a conversation

directly with you about anything he was going to do or supposed to do?

A He had a conversation with me and Drae.

Q Okay.

A It was the three of us.

Q Where was that? Where did that conversation take place?

A In a car. I never talked to him on the phone.

Q Okay. In the car.

A Yeah.

Q And which car was this?

A It was -- we were in Drae's truck.

Q In Drae's truck. And tell me about that conversation.

A They were coming down to try to knock witnesses off.

Q Okay. But I guess what I'm getting at is what words were said by whom?

A I don't remember the exact conversation.

Q Were you doing most of the talking? Was Drae doing most of the talking?

A We was all just talking. I mean if it was something that I needed to put my input in, I did.

Q What was your input?

A As far as independent, like I don't remember exactly what we was talking about, but I knew he was coming down to try to kill witnesses, so.

Q How is it that you know that?

A That's what we went up there and got him for.

Q Okay. When you say we, you mean you and Drae?

A Me and Drae actually drove to West Palm to get him, yeah.

Q Who made the decision to go get him for this purpose?

A Me and Drae, both of us.

Q And who was your target?

A Mari.

Q Are you talking about Jamari Markham?

A Yeah. But he went back before he could do anything because he had stuff to do down here, what he had to do in West Palm.

Q Did you have any conversations with him about compensation?

A With Tre?

Q Yeah, with Tre. And I'll call him Hakiem, okay? Because Drae and Tre gets mixed up for me, so I'm just going to call him Hakiem, okay? Did you have a conversation on this trip, we're calling it the lost trip or whatever.

MR. JOHNSON: Blank.

MR. MILLER: Blank trip. Thank you, Huntley.

BY MR. MILLER:

Q The blank trip. Did you have a conversation with Hakiem about compensation? You know what I mean by

compensation, right? Getting paid?

A I never had a conversation with him about getting paid. I always had conversations with Drae about that.

Q Why is that?

A I wasn't paying him.

Q But I thought both of you were equally involved in the decisions of what needed to be done, it's just he was kind of the bank so to speak, is that a better way to put it?

A Yeah, he was paying for it, I wasn't. At this time, I wasn't really selling drugs like that.

Q What's that?

A At this time, I wasn't really selling drugs like that.

Q Okay. And I apologize when I keep asking you to repeat. I've got about 80 percent hearing loss in my left ear, so that's why sometimes I'll turn my right ear to you, okay?

A No problem.

Q I'm not trying to be combative. You probably know more about my health than you should at this point.

MR. JOHNSON: Put your mask on.

MR. MILLER: Nothing I have is contagious.

MR. JOHNSON: That's what you need to know.

BY MR. MILLER:

Q All right. Did you hear any conversations between Drae and Hakiem about what was being paid?

A All I knew is what Drae told me.

Q Okay. But you didn't hear it from Hakiem?
A No.
Q Let's talk about the third trip. After the blank trip, there's a next trip.
A Mm-hmm, the funeral.
Q The funeral trip. Okay. Did you go down to Palm Beach to get him then?
A Yes.
Q With who?
A Drae.
Q Now, in each of these trips, does Hakiem have a weapon?
A In the blank trip, I don't remember what he had.
MR. MILLER: Do you want me to pause?
MR. EDWARDS: Just one second, one second.
(Brief recess.)
BY MR. MILLER:
Q So we were talking, the last we talked, about the funeral trip.
A Mm-hmm.
Q On that particular trip, you and Drae went to Palm Beach County again, right?
A Right.
Q And did you meet with Hakiem Brockman?
A I picked him up.
Q Same question I asked you before about the blank trip,

the conversations on the way up. Any conversations about what exactly was going to take place, compensation?

MR. JOHNSON: Why don't we do them one at a time, Bill.

BY MR. MILLER:

Q Let's do the first one.

A What was the first one?

Q Any conversations about what was going to take place?

A Yeah.

Q Testing my memory and it's not that good. I'm sorry, go ahead.

A Yeah. We told him that it was Mari grandma's funeral, so we know we would see him -- he would see him leaving the funeral, or going to the funeral and he can catch him then.

Q How did you make him aware of what Mari looked like?

A That wasn't his first time pursuing Mari, but Facebook also.

Q So you and Drae are telling him there's this funeral, you can expect to see this individual, you had previously given some indication to him of what this individual looked like?

A Correct.

Q Did you also arm him?

A I didn't.

Q Did Drae?

A At that time? I don't think so.

Q Did KP?

A KP was incarcerated.

Q How did he have a gun?

A I guess he had his own gun.

Q Okay. There was a time, according to statements that you gave to law enforcement, that he complained about a gun that was given to him. Do you recall that?

A That was the first trip.

MR. JOHNSON: This is Brockman, right?

MR. MILLER: Yes, sir.

BY MR. MILLER:

Q And so is it your testimony today that you believe on at least one of these trips, he brought his own gun?

A Yeah.

Q Okay. Can you describe that gun for me?

A The gun he brought? I don't know. I don't know what gun he brought.

Q Do you know anything about it at all?

A His own weapons for which trip?

Q We're now on the funeral trip.

A Funeral trip? I don't know. If I recall correctly, I think he had a .40, they was talking about a .40, but that was his gun. That ain't no gun he got from none of us.

Q Did you see him with a gun?

A No.

Q On the blank trip, did you see him with a gun?
A The only time I physically seen him with a gun was when we took him back to Palm Beach and the gun that he got from Drae.
Q Was that the first trip, second trip, third trip, or fourth trip?
A When I seen him with the gun or what?
Q Yes, ma'am.
A That was the trip when he killed Quantrale.
Q Was that the first time, the second trip, the third trip, or the fourth trip?
A Second. No, wait. You say the fourth, when was the fourth trip?
MR. JOHNSON: Well, you gave the answer which is when Quantrale was killed. I don't know that you know which number trip it was. If you know, you know. If you don't, you don't.
THE WITNESS: The one when Quantrale was killed.
BY MR. MILLER:
Q You don't know if that was one, two, three or four? We've already established two is blank and three is the funeral trip. Kind of down to one or four.
A The first trip was when KP [indiscernible], the second trip was when Quantrale got killed. Third trip was the blank trip, fourth trip was the funeral trip, fifth trip was the last

trip.

MR. OWEN: I do want to object real quick because the record is not clear. Ms. Neal testified earlier about the first time she met with Hakiem was in Roddrae Williams' father's house which predated all these trips. So she's testified to it, but it's not being attached to a number, and I think that's somewhat confusing [indiscernible].

MR. MILLER: Okay. But later I asked the question how many times total were you in a car with Hakiem, because that was not at the house, I excluded the house. She said four, and we were breaking down those trips at, I believe, y'all's request.

MR. OWEN: That's fine. During this recitation that's being ignored, but she has testified to it.

BY MR. MILLER:

Q Okay. But now it's your understanding there were five trips.

A So you're considering the first trip as Quantrale?

Q Let me go back. I'm going by what you told me, okay? I'm not trying to put words in your mouth, okay? I'm not trying to tell you what trip is what. We had talked about there being four total trips. You had talked about there being a first trip when you first met him, and then --

A That's not when I -- that's when I first was in the car with him.

Q That's when I said there were four total in the car.

A Yeah, but that's not when I first met him though.

Q Fair enough. Okay. So let's clarify, make sure we got this right. A total of five times you've seen Hakiem Brockman, four of them were in the car? Does that make sense?

A Yeah.

Q Okay. So the first trip then in a car would be the blank trip?

A No.

Q No, okay. Tell me about the first trip then.

A That's when Quantrale got killed. The very first time was when he was at his dad's house. He drove himself down here.

Q So let me make sure I've got this right. First time was at the house?

A Right.

MR. OWEN: Let me just help you. That's in April.

MR. MILLER: I got it.

BY MR. MILLER:

Q Second time, what we're now calling the first trip in the car, was when Quantrale got killed?

A Right.

Q Next trip blank trip, next trip funeral trip. What's the last trip?

A When he came down to shoot at the car.

Q Pardon?

A When he came down to shoot Devin.

Q Shoot who?

A Devin.

Q And who is Devin?

A Devin Hathcock.

Q And why did anybody want to shoot Devin Hathcock?

A He was a witness, too. That was his -- that was his kid, though, in the car.

Q What's that now?

A Those were his kids in the car of the retaliation shooting, but he was a witness.

Q And who made the decision that Devin was an important target?

A Me and Drae.

Q Did that have anything to do with conversations that you had with Mr. Ramsey?

A I mean he didn't tell us that he was, but yeah, we knew who all the witnesses was because of Ramsey.

Q Okay. And at some point, as I understand what you've told law enforcement, you became aware or at least believed that Devin Hathcock was cooperating with law enforcement?

A Correct.

Q And that was the reason you made the decision to do something about it?

A Correct. We made the decision.

Q Okay.

MR. JOHNSON: You plural. You and Drae, that's what you meant, right, Mr. Miller?

MR. MILLER: Yes, that's what I meant.

BY MR. MILLER:

Q Did you, at that time, see Hakiem Brockman with a firearm?

A Yeah.

Q Pardon?

A Yeah.

Q Tell me about that.

A Drae give him a KelTec.

Q What is a KelTec?

A A gun.

Q What kind of gun? Long gun? Assault rifle? Pistol? Automatic? Revolver?

A I don't know. I just know it's a gun.

Q What did it look like?

A It fold up.

Q Okay. Who is Draco Z?

A Kenzel.

Q Where does Draco Z come from?

A Honestly, I don't even know. It ain't a Draco. He never had a Draco, so.

Q Never had a Draco?

A No. Something we just started calling him.
Q Did he ever just pose with one?
A No. We just started calling him.
Q What conversations did you have with Hakiem Brockman on the final trip, the trip that was supposed to involve Devin Hathcock?
A He said he just sprayed the house.
Q Was this on the trip back?
A Yeah.
Q Did he say why he just sprayed the house?
A No.
Q Did he discuss what he was going to be paid for spraying the house?
A I never discussed money with him.
Q Did Drae, in your presence, discuss money with him?
A No. Drae only discussed it with me. I don't know what they discussed.
Q So in the rides back and forth, there was not money any money passed or any discussion of money being passed?
A No.
Q Was there a discussion of taking care of Hakiem Brockman's children?
A In that trip, no.
Q Okay. Was there ever any other time that you and Drae or anybody else involved with 4K had contacted anyone else about

trying to eliminate a potential witness?

A Drae asked DayDay one time.

Q Drae asked who?

A DayDay.

Q DayDay?

A Yeah.

Q Who is DayDay?

A Dan.

Q Who is he?

A He's a codefendant in my federal case. He a friend of Drae's.

Q And what did DayDay do?

A He ain't do nothing. Pretty sure he told him no.

Q Was there not an incident where someone was trying to eliminate somebody and then ended up getting hit by a truck?

A They was trying to eliminate me. That was people shooting at us.

Q Tell me about that.

A What about it?

Q Tell me about what happened.

A I was outside on the phone and I heard DayDay screaming Drae name, backing up in the truck, and saying somebody come from around the shed with, like, a mini AK. And he shot it one time, and after he shot it, DayDay ran him over.

Q Who was that person?

A I don't know.
Q Was that person subsequently arrested?
A I don't know.
Q Was that person killed?
A I don't know.
Q You don't know anything about what happened to that individual after he was struck by the truck?
A This happened in May, feds got Drae in -- I mean this happened in April and feds picked him up in May, so I don't -- I don't know what happened. I don't even know exactly who it was.
Q Do you know why anybody would be coming out there with bad intentions towards Drae?
A Street beef.
Q Do you know any more specific than that? Was that individual involved with 56 at all?
A I don't know if it was exactly him. I feel like he sent somebody.
Q Who? Who?
A Little E. I don't know if it was him that actually did it.
Q You said Little E?
A Yeah.
Q Who is Little E?
A A member of 56.
Q What's his real name?

A Andrew.
Q What's Andrew's last name?
A Maddox.
Q Maddox? How old is Andrew Maddox?
A I don't know.
Q Would it be safe to say that 56 people are generally much younger than the 4K people?
A Some of them.
Q Some of them were juveniles.
A Yeah.
Q Most of them were younger, right?
A Yeah.
MR. MILLER: Tom, go ahead while I go through some of this stuff?
MR. EDWARDS: All right. I only have a handful of questions.
BY MR. EDWARDS:
Q My name's Tom Edwards and I represent your cousin, Roddrae --
A Mm-hmm.
Q -- Williams. Right? He's your cousin how?
A His grandma and my grandma are sisters.
Q Okay. Did you grow up with him in Alachua?
A I knew him, we was -- yeah, we was both in the same neighborhood. The same area, not neighborhood really.

Q When did you guys start associating?
A I associate with him all my life.
Q All right. So you've been knowing him, hanging with him all your life?
A No, I ain't really start hanging with him like that until 2016.
Q Okay. And what brought you two together? How did you start hanging with Roddrae?
A I was always friends with his baby mama.
Q Who's that?
A Deiondra.
Q All right. And so how did it come together?
A I mean I hung out with him before 2016. I don't know, it just happened, I guess.
Q And what would you say his primary occupation was?
A Who?
Q Roddrae.
A Sell drugs.
Q That was it, right, sold drugs?
A Yeah.
Q And so this whole -- when you met with Roddrae, did 4K even exist?
A I don't think they was calling themselves 4K.
Q Just the same dudes that you're talking about hanging out?

A Yeah.

Q You're the only female in the group?

A Yeah, you could say that.

Q Right? I mean you occupy a special spot.

A That's what you say.

Q I mean number one, if you're the only female in a family of ten people, you occupy a special spot, right, because you're the only female. Right? Just by virtue of the fact that you're the only female in this group of guys, you occupy a special spot.

A I mean that's what you think. I don't think that, so.

Q You just think you're one of the guys?

A I just think we just -- it is what it is.

Q And what is it?

MR. OWEN: What do you mean by special spot?

BY MR. EDWARDS:

Q Yeah, I mean you're the only female in a group of guys, right?

A Yeah.

Q And you know all these dudes, right?

A Yeah.

Q Every one of them?

A Yeah.

Q And you gave a list of them all, so give me that list again.

A The list of what?
Q Of the people that were in this group. I didn't want to call it a gang, I'm going to let you try to define that for me, but I'm going to call it a group of people that are together that have some common interests.
MR. JOHNSON: Are you talking about 4K, Tom?
MR. EDWARDS: I'm talking about this group that is referred to as 4K.
BY MR. EDWARDS:
Q So you got JJ.
A Yeah.
Q Who's that? What's his real name?
A Jeffery.
Q What is it?
A Jeffery.
Q Jeffery what?
A Robinson. Robinson.
Q How long have you known Jeffery?
A Jeffery live like one block over from me.
Q And you've been knowing him how long?
A A long time.
Q As long as you've known Drae?
A No. I know Drae longer.
Q Okay. But give me a number like years.
A I don't know.

Q 20?

A I don't know.

Q All right. So how did you know JJ was part of this group?

A He was with them.

Q All right. So let me put it to you this way. When did you first learn that Drae was involved with any kind of drug activity?

A When he went to jail. The very first time he went to jail.

Q When was that, do you remember?

A I don't remember the year. I know he end up going to prison though.

Q Okay. And then he gets out, and that happened before 2016, right?

A Yeah.

Q He gets out, and do you approach him, say hey, I need to make some money?

A I don't remember exactly how it went, but I do know that I did buy drugs from him, yeah.

Q And what was it primarily?

A Cocaine.

Q Powder, crack, both?

A Powder.

Q Okay. Did you cook it yourself?

A No.
Q You sold it as powder?
A Yeah.
Q Or did you have somebody else cook it?
A I sold it as powder at first.
Q Okay. And what kind of quantities were you buying from him at first?
A Ounce.
Q Okay. And you knew this, this was comfortable for you because you knew what Drae was up to, right?
A Yeah.
Q And so how did you learn that there is this group of people that, at some point, start to call themselves 4K?
A At that point, I was hanging with them every day.
Q Okay. So you get into 2016 and boom, whatever you were doing before 2016, which was what?
A Working.
Q Like just odd jobs?
A Yeah.
Q Like service jobs, that kind of thing? Like what?
A I had a couple different jobs.
Q Like what? What were they?
A I worked at Waffle House.
Q Okay. Because you worked at the Waffle House, did you go back to work at the Waffle House when the feds came and got

you?

A Yeah.

Q So you worked at the Waffle House before 2016?

A Yeah.

Q And then when the feds came and got you in, what was that, 2021?

A 2020.

Q 2020?

A Yeah.

Q You went back to the Waffle House and started working there?

A I was working there when the feds came and got me.

Q Right, but I mean you quit at some point, right?

A Yeah.

Q Because when you started hanging out with this group, you quit?

A No.

Q You continued working at the Waffle House?

A I always had a job when I was with them. There was never a time I ain't have no job.

Q Okay. So you're working with them and -- do you have any kids yourself?

A No.

Q So the whole time you're with them, 2016, you start your work maybe at the Waffle House.

A No, I was working at HarborChase.

Q HarborChase. Isn't that like a retirement community or something?

A Yeah.

Q As what, as a CNA?

A No, a med tech.

Q And your primary motivation was what, to go and start doing this illegal activity?

A I lost my job when I got pulled over in Madison.

Q Okay. What happened there?

A What you mean? I lost my job.

Q You got pulled over in Madison. Why did you lose your job if you get pulled over?

A Oh, because I threw some weed out the window, and I had possession of a firearm but it was a concealed weapon.

Q And that was in 2016?

A Yeah.

Q And so that was in Madison, Florida?

A Yeah.

Q What happened to those charges?

A I got put on some kind of deferment or something like that. I don't remember.

Q So you lost that job?

A Yeah.

Q And you needed money.

A So I was working at Circle K, but yeah, I needed more money.

Q So you got some kind of deferment, while you got this deferment, you decided to start slinging some coke for -- or not for Roddrae, you were buying it and doing your own thing, right?

A Right.

Q So he'd give you a good price on it, you take the ounce, go do your own thing?

A Right.

Q While you're on the deferment?

A Right.

Q Okay. And so you sell your first ounce, you make a little bit of money, and then what, you say hey, this is a good gig, this is a good side hustle, I'll keep a job but I'll do this on the side?

A Mm-hmm.

Q And so you start going back to Roddrae?

A Yeah.

Q And Roddrae was always your source for drugs?

A Only person I ever bought it from.

Q And so how did you learn about, you know, these other folks were also associated?

A Just being around. I knew them growing up with them.

Q All right. And so when you come into this and you're about how old in 2016?

A 26.

Q 26. Up to that point, you've lived a pretty law-abiding life, right? Little bit here, little something there, but nothing big.

A Yeah.

Q But now you're gonna get into selling drugs?

A Mm-hmm.

Q And you start hanging out with these individuals that later take on the moniker of 4K?

A Yeah.

Q So what do you find out? What's everybody doing? Are they all dealing?

A Yeah.

Q They're all just hustling drugs here and there?

A Yeah.

Q So you're in this group of people before they pick up this 4K thing, correct?

A Boric started rapping real heavy in, like, 2017, I think. That's where 4K came from. It was his record label.

Q Okay. And so did you guys, like, sit down and say hey, we're gonna be 4K?

A No, not necessarily.

Q All right. You got any tats that say 4K?

A No.

Q There wasn't anything, like, special tat that you guys

all had? Like, you know how the Crips or the Bloods, they all got certain kind of tats? Different gangs that are real gangs have tats, right?

A Yeah.

Q Are you familiar with anybody like the Crips, the Bloods, anything that's more organized?

A No.

Q You ever been associated with anybody like that?

A No.

Q So what I'm really starting to understand here, this wasn't really a gang at all?

A That's what the news called it. They gave us this name of a gang.

Q Right. And so did you even -- Boric starts doing this thing with his record label 4K.

A Mm-hmm.

Q And he says hey man, the group of us, whosever sitting in this room, the four of us, six of us, we're like all 4K?

A No.

Q Never even got to that point?

A No.

Q And 4K was -- it was a street address, right?

A Yeah.

Q What was that street address?

A 134.

Q 134th. Who lives on 134th?
A Drae grandma and Tootie.
Q Tootie.
A Yeah.
Q And so you think that's where Boric got the 4K from?
A Yeah.
Q What's the K stand for?
A Just was common.
Q Just what?
A It was just common. Just something that went with it.
Q Okay. Didn't stand for anything at all as far as you know?
A No.
Q And the four didn't stand for anything other than a number in an address, 134?
A Yeah.
Q And how did you learn that, that the number four, the four in the 134 was --
A It's just what they call the street, the four. If I call Drae and say where he at, if he at his grandma house, he say I'm on the four.
Q Okay. All right. And so that's how you think Boric got the idea of 4K for his record label?
A Yeah.
Q So the only reason you called it a gang is because

you're saying the newspaper called it a gang?
A Yeah.
Q There was no structure? There was no general? There were no sergeants?
A No.
Q There were no infantry?
A No.
Q Everybody basically did what they did for themselves?
A Right.
Q So Roddrae had access to drugs, and he supplied drugs to that little clique of individuals that he trusted?
A Mm-hmm.
Q But as far as he'd sell them to you and he kept selling them to you, right?
A Mm-hmm.
Q Ounces. And did you go up from ounces?
A No, if I needed to buy more, I'd buy more.
Q Okay. And again, this was -- you're making 1,400 bucks a week, say you're netting 1,400 bucks a week, that's more than you can really net working at the job, right?
A Yeah.
Q So I mean the job is really kind of a side hustle, and the drugs are the main hustle?
A Yeah.
Q So when Roddrae would sell you those drugs, he'd tell

you how to sell them?
A The very first time.
Q And after that, you're on your own?
A Yeah.
Q If you get ripped off, it's on you?
A Yeah.
Q Right? If, you know, somebody steals your stash, that's on you. Because you pay him on the front end or you pay him after you sold them, right?
A I done both.
Q Okay. You ever get ripped off?
A Yeah, one time.
Q At gunpoint?
A No.
Q How did you get ripped off?
A Somebody came in the house to buy something and they stole it.
Q How much?
A Wasn't a lot. Like a half ounce.
Q Half ounce. You still had to pay for it, right?
A It was paid for.
Q Yeah. So that's your loss?
A Yeah.
Q So everybody else, same thing, right? They bought drugs from Roddrae, they pay Roddrae, he's the wholesaler, and

you guys go out and sell them retail. You guys go out and sell them to whoever you wanted?

A He did both.

Q What's that?

A He did both.

Q He did, but I mean you guys, when you came to him, he's like -- you picture, like, a wheel, right? And in the middle of that wheel you got the hub. And so he's the hub of the drugs, right? And so you guys are just coming to him and getting the drugs and then he's selling them to you and you're going out and doing whatever you want with them. You can flush them if you wanted to. He's not telling you, directing you, demanding that you go sell those drugs or anything, right?

A Everything I did, I did on my own.

Q And that's the same thing with everybody else?

A Right.

Q They all did on their own?

A Right.

Q There is no commander in this group.

A No.

Q There is no general in this group. Right?

A No.

Q Right now you're on five years of probation?

A Yes.

Q Federal?

A Yeah.
Q No state?
A Yeah, no state.
Q So you got concurrent probation going on?
A Yeah.
Q When you got picked up at the Waffle House and they took you directly to the federal courthouse, right?
A Yeah.
Q And they put you in a federal holding cell?
A Yeah.
Q Did they tell you where they were taking you?
A Court.
Q Had you met with any of those federal agents before they came and got you at the Waffle House?
A I don't know. I don't know. I mean the house got kicked in in the July, I don't know if it was federal agents there or not. I know Chalker, he wasn't no federal agent, though.
Q Okay. So they come and get you at the Waffle House, and they take you to -- take you to the federal courthouse over here, right?
A Yeah.
Q Put you in one of those big cells with the bars?
A Yeah.
Q And at that point, Huntley was only your attorney on

the state case, right?
A Yeah. I mean the federal case. He wasn't on the state case yet.
Q Where was the federal case? Had you already been indicted?
A Yeah, when they picked me up, I was indicted.
Q At the Waffle House?
A Yeah.
Q And that was in 2020?
A Yeah.
Q When did you get indicted?
A 2020.
Q And you went to court on that when you first got indicted?
A Yeah.
Q Do you remember what month that was?
A June.
Q Okay. That's when Mr. Johnson was appointed, right?
A Right.
Q And so he was your federal attorney from that point forward?
A Right.
Q At this point, you had not gotten your agreement for transactional immunity, correct?
A Right.

Q And now you knew you were in some serious trouble?
A Right.
Q You had some things going on. You had these VOPs hanging out there, dealing drugs while you're on pretrial release, et cetera, et cetera, right? And see you're looking to do something. And Mr. Johnson's doing his job, like he should do, right? He's got one job. Mr. Johnson only has one job when he represents you, and that's you. So he's doing his job and says you need to help yourself, right?
A I mean he did his job.
Q Right. And everybody in this room knows how that works.
A Yeah.
Q This ain't no surprise. This happens all the time.
A Yeah.
Q And told you you need to help yourself. If you're gonna get out of this, you need to help yourself.
A Told me I need to worry about myself.
Q Mm-hmm. And when did you first find out that this involved way more than just these drugs? Was it after you got picked up from the Waffle House?
A Yeah.
Q Or was it before?
A What you mean?
Q You know, when you got charged in federal court, there

was a drug charge, right?

A Yeah.

Q So as far as you know, everything's still drugs?

A Yeah.

Q And all the drugs basically lead to Roddrae?

A Yeah.

Q Right? I mean he's the one.

A Yeah.

Q But then there was this whole backdrop of everything else that was going on with these retaliations. Everything started with Big Country, right?

A Yeah.

Q Everybody liked Big Country.

A Yeah.

Q And Big Country was -- he was part of this group that is loosely related to 4K, right? I mean he wasn't part in the -- he didn't hang out with you guys every day, but he was part of it. Y'all had affection for him.

A Yeah.

Q And that wasn't a situation that was supposed to happen, but it's what started the whole -- this whole avalanche of things that happened afterwards, right?

A I mean we had beef with them before that. He wasn't supposed to be in it, though.

Q Right. He didn't have anything to do with it.

A No.

Q So when did you learn that your cooperation was going to be involving way more than just the drugs?

A I don't remember the exact date.

Q No, I don't expect you would remember the date, but it was after Mr. Johnson was appointed in your federal case, correct?

A Yeah.

Q And were you then in federal custody or were you released from that custody?

A I was in federal custody.

Q Out in Dixie County?

A Yeah.

Q And when was the first time that Mr. Johnson or any agents came to you out in Dixie County and told you that once you had agreed to cooperate and told you what the scope of the investigation was -- and you know what I mean by the scope? What all it involved, not just the drugs.

A So you're asking when did I find out?

Q Yeah. So if you got indicted in June of '20, Mr. Johnson's your lawyer, when do you find out that hold on a second, now you're bringing up things that have nothing to do with drugs.

A I don't remember the exact date.

Q Were you told that that's what it was going to be

about?

A Yeah.

Q And you met with Mr. Johnson, and you met with Mr. Owen, and you met with Mr. James McCain, is that right?

A Yeah.

Q Do you know who James McCain is?

A Yeah.

Q The federal prosecutor?

A Yeah.

Q You met with him after your June indictment, correct?

A I don't remember exactly when I met with him.

Q But it was not until after your June indictment?

A Yeah.

Q And is that when you learned? I mean you agreed to cooperate, right? You signed a cooperation, what they call a Rule 11 letter?

A I don't know what they call it, but yeah, I agreed to cooperate.

Q And it was explained to you about your cooperation, what it would involve?

A Yeah.

Q And were you transported? I'm sure you were transported to the federal courthouse for your proffers?

A No.

Q You did it out in Dixie County?

A Yeah.
Q In that one little room up front?
A Yeah.
Q With all that equipment and other crap in there?
A I don't remember what was in there.
Q And you're behind the glass?
A No, I wasn't behind a glass.
Q Was it done in a different room? I mean you know the visitation room up in Dixie County?
A No, I never -- visitation wasn't open when I was there. You mean lawyer visit?
Q Yeah.
A I wasn't going in that room.
Q So did you know, prior to meeting with all these folks -- and I don't mean your lawyer, I just mean the government, the state, and the federal government -- the scope of this investigation?
A When you say scope, what you mean?
Q That it involved more than drugs?
A Yeah.
Q That the main focus, for your purposes, was going to be on Brockman and all those activities?
A Yeah.
Q And were you promised anything before you started giving that information?

A I mean I spoke with my attorney before anything. I spoke with him before I spoke with anybody.

Q And so you told Mr. Johnson your involvement in those murders for hire?

A Yeah.

Q And you authorized Mr. Johnson to take that information and take it to the state and try to cut a deal for you?

A Yeah.

Q And Mr. Johnson came back and said that he had the deal of a lifetime for you?

A Yeah.

Q And you understand it's the deal of a lifetime, right?

A I do.

Q And he told you that you were going to get complete immunity, complete immunity for any involvement in the murders committed by Brockman or any of the attempted murders, correct?

A Yeah.

Q And what did you have to do?

A Testify truthfully.

Q Testify truthfully. So you had a role --

A Yeah.

Q -- as it kind of relates to this loosely organized group? And again, you don't call it a gang, right?

A I mean that's what --

Q I know that's what everybody else wants to call it.

A That's what it is.
Q But now that's what it is? I thought you said the paper called it that, but it's not really a gang.
A Do you know the definition of a gang?
Q What's that?
A Do you know the definition of a gang?
Q Yeah, there's actually a legal definition.
A Oh, okay.
Q Okay. So did you tell people what to do?
A No.
Q Did anybody tell you what to do?
A No. I mean I've done stuff with Drae before, yeah.
Q But nobody ever told you what to do?
A No, he asked.
Q Do you remember that little situation when you were in the shower?
A Yeah.
Q Let's go through that again. Tell me about that. What happened?
A When I was in the shower and my phone rung?
Q Yeah, and Drae came and asked you a question.
A Mm-hmm.
Q So let's talk about that again. Tell me that from the beginning. What's your understanding of what happened there?
A From the beginning of what?

Q That situation. That day.

MR. OWEN: Can you rephrase? You want her to walk you through that day?

BY MR. EDWARDS:

Q No, I want you to walk me through that event. Just the phone call.

A Oh, while I was in the shower, my phone's ringing, it was KP.

Q And KP is who? All these initials, I want it for the record. KP is?

A McKenzly.

Q McKenzly.

A Yeah. And he said I see Quantrale. Drae said they see Quantrale, what you want to do? I say go ahead.

Q So you -- McKenzly calls in?

A Mm-hmm.

Q Says he sees Quantrale?

A Yeah.

Q He's talking to Roddrae Williams, right?

A Yeah.

Q And Roddrae Williams doesn't tell him to do anything, right?

A Nope.

Q Roddrae Williams comes to you?

A Yep.

Q Roddrae Williams asked you --
A Yeah.
Q -- what he should do?
A Yeah.
Q And you said that he should kill him?
A Yeah.
Q That sounds like an order.
MR. OWEN: Is that a question?
BY MR. EDWARDS:
Q Well, what does it sound like to you? A suggestion?
A Ask my opinion.
Q Okay. You're the one who gave the go ahead.
A Yeah.
Q You could have said don't do it, right?
A Yeah.
Q And it wouldn't have happened.
A I can't say that.
Q Might have done it on his own?
A He might have listened to Drae and said -- he might have went with what Drae thought, I don't know. I can't say what would happen.
Q Right, but Drae came to you and asked you. He didn't make the decision.
A If I wasn't around, he would have.
Q But he didn't.

A You're right.
Q You made the decision to have him killed.
A Absolutely.
Q All right. And that's what you told the government before, right?
A Yeah.
Q Because you know they got everything, we got what the government has.
A Yeah.
Q And so you got to be consistent. Do you know the consequences if you misrepresent or lie about something?
A Yeah.
Q What is that?
A Perjury.
Q Prison?
A Perjury.
Q Perjury?
A Yeah.
Q They can't come back on you now, right, because you've got immunity --
A If I don't testify truthfully.
Q -- transactional immunity, right? That's been explained to you?
A If I don't testify truthfully it can.
Q You're saying the first time you saw Brockman was at

Roddrae's father's house?

A Yeah.

Q How far back does that go?

A I don't remember the exact date.

Q Well, if we start with the first time Brockman came here for business back in January of 2018, it was before that, right?

MR. OWEN: That's incorrect.

THE WITNESS: He didn't come in January.

BY MR. EDWARDS:

Q Oh, I'm sorry, when was the first time? First trip was -- let me rephrase this. When you saw Brockman at Roddrae's daddy's house -- what's his dad's name?

A Reggie.

Q Reggie?

A Yeah.

Q And that's his biological father?

A Yeah.

Q And that makes him kin to you, right?

A Yeah.

Q Is he your uncle?

A Cousin.

Q Cousin. Who all was there?

A Me, Drae, Tootie, and Brockman.

Q And was he introduced to you?

A No.

Q You just recognized his face?

A No, I just knew -- I ain't even know him honestly. I knew what he came down there for, I knew why he was there, but I ain't know him.

Q On that occasion you knew why he was there?

A Yeah.

Q Why was he there that time?

A To shoot Mari.

Q And you know who picked him up from West Palm Beach?

A He drove.

Q That's when he drove by himself?

A Yeah.

Q That's the first time you ever laid eyes on him?

A Yeah.

Q Had you had anything to do with him getting there?

A I talked to KP. But as far as what?

Q You talked to KP about what? And who's KP?

A McKenzly.

Q And talked to him about what?

A Him coming down.

Q When did you talk to KP?

A Before he got there.

Q Before who got there?

A Tre.

Q How did that conversation go?
A I don't remember exactly.
Q So KP is in West Palm?
A Yeah.
Q And does he give you a call up?
A I don't remember exactly. I know I talked to him though.
Q And what did you talk to him about?
A That he was coming down here. And actually, I sent KP my address for him to meet Drae at my house because I had to go to work.
Q So now this is all information that you've already supplied to the government, right?
A Yeah.
Q You already told the government all about this first contact?
A Yeah.
Q So KP calls you up and says I got this dude Brockman, he's coming your way.
A I don't know if that's exactly how it went.
Q I certainly don't know how it went. So you know, I'm just trying to help refresh your memory. So KP calls you up and says what?
A I don't remember the exact conversation.
Q Well, there had to be some conversation you had with KP

prior to this.

A Yeah, he told me that he was coming and he needed an address.

Q So who made this decision to get in touch with KP and see if KP could find somebody to come up and do the lick?

A I don't know.

Q So KP -- you're just hanging out, and KP, all of a sudden you get a call from KP and he says hey, this guy Brockman's coming up?

A I don't remember the exact conversation.

Q Well, you had to know about it before, right? You knew that this was in the works, right?

A No, I knew about it when he called me.

Q So tell me what you knew about when he called you.

A I just told you.

Q Tell me kind of how it went based on your memory. Give me your best recollection of KP calling you.

A He told me he was coming out here and needed an address.

Q Who's he?

A I was on the phone with KP.

Q You were on the phone with KP and who's coming down here?

A Tre.

Q Tre. Brockman?

A But I ain't know his name then.
Q You just knew him as Tre?
A I ain't know him as nothing. I just knew there was a dude coming.
Q A dude coming.
A Yeah.
Q And where was he -- he was supposed to come see you, but you had to go to work?
A Yeah.
Q He's coming to your house?
A He went to my apartment.
Q Which apartment?
A It was in Gainesville.
Q Where in Gainesville?
A The North Pointe Villas.
Q All right. So KP tells you that Tre, who you don't even know, is coming to Gainesville and he needs your address, you give him your address?
A Yeah.
Q Do you know why he's coming to Gainesville?
A Yeah.
Q Why is he coming to Gainesville?
A Shoot the witness.
Q To shoot who?
A The witness.

Q Which one?
A Jamari.
Q Jamari?
A Markham.
Q Markham. All right. So you talk to KP?
A Yeah.
Q KP tells you this dude Tre is coming to town, he needs your address?
A I ain't know his name.
Q Didn't know his name. This dude's coming to town?
A He ain't say he needed my address, he say he needed an address.
Q You gave him your address?
A Right.
Q Because you're here to meet this -- is he a hit man?
A I don't know what he is.
Q He's going to do the lick?
A Yeah.
Q And so what happens after he says he's coming to your house?
A I went to work.
Q And then what? Did he come to your apartment? He's supposed to come to your apartment.
A He didn't go in my apartment. I don't know what he did. I was at work.

Q Then what?
A I worked.
Q Where were you working then?
A Circle K.
Q So you're at Circle K, and this dude's coming. Do you pass that information on to anybody?
A Yeah, I told Drae he was coming.
Q Okay. And then what? Somehow you end up back at Drae's daddy's house.
A Yeah, when I got off work.
Q You got off work. Did you call him?
A I don't remember.
Q All right. And you get to Drae's daddy's house and who's all there?
A Me, Drae, Tootie, and Tre.
Q Okay. So now, you got this group assembled, and you're the one who kind of was the one talking to KP, right?
A Between me and Drae? I didn't talk to KP no more after I went to work.
Q All right. But you made that arrangement for this guy to come into town, he comes into town while you're at work, next thing you know --
A I didn't make the arrangement for him to come to town.
Q Well, who did?
A I don't know. I just told you it.

Q So you don't know how this whole -- because this is the very first event, right?

A Yeah.

Q This is the very first thing.

A Yeah.

Q So whose idea was it?

A I don't know.

Q Was it KP's?

A I don't know.

Q Was it something y'all sat around and talked about?

A I had a conversation with Drae about -- we was talking about getting rid of witnesses, but I don't know how his name came about. I never -- I don't know the dude, so how am I gonna know that that's what he do?

Q Okay. So you wanted to get rid of witnesses, and these witnesses were witnesses to who? And who are all the witnesses?

A The witnesses to Kenzel and KP.

Q Okay. So you don't have anything to do with that, do you?

A No.

Q Right? Drae didn't have anything to do with that?

A So we was always -- it was us. That's what it was.

Q Who's got the biggest interest in that, in getting rid of those witnesses?

A Probably me.

Q Why you?
A Because Kenzel wasn't supposed to do that, so I ain't want to see him go.
Q You had the biggest interest. You wanted him gone?
A That what you want to say.
Q But you just said it. I didn't put that word in your mouth. I said who has the biggest interest and you said you did.
A I said probably me.
Q And your biggest interest in that was why?
A Because Kenzel, he didn't deserve that. He wasn't even supposed to go that night, so.
Q So you were gonna help Kenzel?
A Yeah.
Q That was your goal?
A Yeah.
Q That's something you put into motion? Right?
A No.
Q You have the biggest interest and it's not something you put into motion?
A From my point of view, I did. I can't tell you what they think.
Q From your point of view you did?
A Yeah, I wanted to help Kenzel.
Q So you put it into motion?

MR. OWEN: What is it? Can you please rephrase the question?

MR. EDWARDS: This whole murder-for-hire thing.

THE WITNESS: No.

MR. JOHNSON: She's answered that five times.

MR. EDWARDS: Every time I keep getting a little bit more information here that kind of makes me doubt what exactly it is.

BY MR. EDWARDS:

Q I mean you're already here.

A Yeah. I know.

Q You're already got your immunity.

A Yep.

Q And so the only thing you tell them now, you can't hurt yourself by telling the truth, right?

A I'm telling you the truth.

Q So you had the biggest interest in it.

A I wanted Kenzel free.

Q And whatever it took. If it meant killing some witnesses, that's what needed to be done?

A When the conversation came about, I was with it.

Q All right. You don't remember who brought that conversation up?

A No.

Q But somehow, KP got it in his mind that he was going to

go down to West Palm or was in West Palm and knew somebody he could send up this way, right?

A I don't know. I don't know how that came about in KP mind. I ain't in KP mind.

Q Right. You just got the phone call saying he's on his way?

A Right.

Q And you knew what he meant by that?

A Right.

Q It wasn't, you know, the Fuller Brush man that was on his way. This guy was on his way to come do a hit as far as you knew.

A Yeah.

Q You said that, also, as far as you knew, that Brockman was only paid once?

A I seen him actually get money once.

Q Okay. And what time was that? Was it this time?

A No, I ain't see him get money that time. I don't remember exactly what trip it was, but I know he got paid half. I seen Drae give him money.

Q And you don't know -- but you don't know what the deal was?

A Yeah, he needed half the money before.

Q Right, but you don't know what half was because you don't know what the deal was.

A I know what Drae told me.
Q What did Drae tell you?
A How he gave him 700 up front.
Q Okay. And so the deal was 1,400?
A 15.
Q 15?
A Yeah.
Q And also some weed and a place to stay and that kind of thing?
A I don't know about weed, but place to stay, yeah.
Q Pay for his room?
A Yeah.
Q And this was on that first trip?
A I just said no.
Q Okay. On this first trip, what happened?
A As far as?
Q The first time you saw Brockman. What occurred that time when Brockman was up here?
A He shot at Mari and Quantrale was in the car.
Q And Mari was the target, right?
A Yep.
Q Quantrale was not the target?
A Nope.
Q And you know nothing about any payments on that occasion?

A As far as what?
Q As far as Brockman getting paid.
A I didn't see him get paid.
Q All right. And you didn't make any arrangement?
A No.
Q And you don't know if KP did?
A I don't know what KP did.
Q And what month was that?
A I don't remember.
Q 2018?
A Yeah.

MR. MILLER: Do you mind if I jump in with three real quick?

MR. EDWARDS: Go ahead.

MR. MILLER: Just a couple follow up. We're almost done.

BY MR. MILLER:

Q Is it your understanding if you don't testify consistently with the proffers that you gave, that that would be a violation of your federal probation?
A Mm-hmm.
Q Is that a yes?
A Yeah.
Q Okay. Was there ever a hit put out by Drae on Little E?

A He tried -- he asked DayDay about that.
Q DayDay is Willis?
A Yeah.
Q Okay. Was that before or after the incident where you almost got hit? Where there was the shooting and then the guy got hit with -- the masked person got hit with the truck, do you remember?
A No. I don't remember.
Q Okay. And then who is Gregory Jones?
A Dude from Alachua?
Q Pardon?
A Dude from Alachua?
Q Yeah. Was he a member of 4K?
A Not really, no.
Q Did they call him Moody?
A Yeah.
Q Why did they call him Moody?
A I don't know. He rap, too. I guess that was his rap name.
Q But he hung out with you guys, right?
A From time to time.
Q Pardon?
A From time to time.
Q Okay. And what about Adarious?
A No. He grew up with us. That's my godbrother.

Q But he wasn't really a member of 4K? What about Shambre Durr or Sham?

A She grew up with them.

Q That's the one we talked about before when you were saying Sham, that's who Sham is?

A Yeah.

Q Gotcha. And what about Damon Presley?

A Damon.

Q Damon?

A He live with Boric.

Q He lived with Boric?

A Yeah.

Q Okay. So he would hang out with the group, too, but he's less a member than the other people we talked about?

A Yeah, he worked.

Q Okay, fair enough.

MR. MILLER: Thank you.

THE WITNESS: Mm-hmm.

BY MR. EDWARDS:

Q You never heard Roddrae ever give any command or order to anybody to kill anyone, correct?

MR. OWEN: You're asking her in relation to this case, right?

MR. EDWARDS: Yes.

THE WITNESS: What you mean?

BY MR. EDWARDS:

Q Like you wanted the witnesses dead.

A Mm-hmm.

Q All right? And I guess that was something that everybody kind of comes together and says yeah, sounds like a good idea?

A Yeah.

Q But whether those witnesses died or not, Roddrae didn't care?

A He did.

Q Just because of his loyalty?

A Yeah. And at some point, JJ went to jail for it. That's like they little brother almost. They cousins, but they more like brothers, so.

Q You said you used your firearm one time?

A Yeah.

Q What was that situation?

A KP and Woody was fighting, and I seen Hathcock, like, raise his gun like he was about to shoot Drae, so I shot at him.

Q Did you hit him?

A No.

Q How many shots did you fire?

A Five or six. I don't know how many the gun held.

Q Where was that at? Where did that take place?

A In Alachua.

Q Near someplace?
A Up the street from his grandma house.
Q So right there in the neighborhood?
A Yeah.
Q Sounds like a pretty dangerous place to be living.
A If that's what you want to say.
Q 56 was how far over?
A From where?
Q From 4th, 64.
A Across town.
Q Across town?
A Yeah.
Q So they never have any business over there?
A No.
Q Was 56 more of a gang?
A I don't know what they was. I guess, yeah.
Q Did they have tats?
A What?
Q Did they have tats, 56?
A I don't know.

MR. EDWARDS: I don't have anything further.

MR. OWEN: I have no questions.

MR. MILLER: You said she'll read, Huntley? Okay. Why don't you read into the record a phone number -- or Huntley, do you want to take care of that?

MR. JOHNSON: I'll take care of it. Just have them contact me and I'll get it to her and she can read.

MR. MILLER: So for the record, the witness will read and Mr. Johnson is the contact for that.

CERTIFICATE

STATE OF SOUTH CAROLINA )

COUNTY OF GEORGETOWN )

I, Michelle Downes, do hereby certify that the digitally recorded deposition of Rakeidra Neal, taken on November 2, 2022, in the case of the State of Florida versus Hakiem Tri-Vonate Brockman, McKenzly Alphae Edwards, Jr., Roddrae Williams, and Jeffery Robinson, pending in the Circuit Court of the Eighth Judicial Circuit in and for Alachua County, Florida, Case No. 01-2019-CF-000263-A and 01-2020-CF-3644-ABCD, was transcribed by me and that the foregoing constitutes a true and accurate transcription of said deposition.

DATED: January 23, 2023



Michelle Downes
Florida Digital Reporting, Inc.
209 SW 2nd Street
Gainesville, Florida 32601
352-336-0963

E R R A T A   S H E E T

This is to certify that I, Rakeidra Neal, have read the foregoing transcription of my testimony In Re: State v. Hakiem Tri-Vonate Brockman, McKenzly Alphae Edwards, Jr., Roddrae Williams, and Jeffery Robinson given on November 2, 2022 and find same to be a true and correct transcription of said testimony with the following changes (if any):

| PAGE | LINE | SHOULD READ: |
|---|---|---|
| _____ | ______ | __________________________________________ |
| _____ | ______ | __________________________________________ |
| _____ | ______ | __________________________________________ |
| _____ | ______ | __________________________________________ |
| _____ | ______ | __________________________________________ |
| _____ | ______ | __________________________________________ |
| _____ | ______ | __________________________________________ |
| _____ | ______ | __________________________________________ |
| _____ | ______ | __________________________________________ |
| _____ | ______ | __________________________________________ |
| _____ | ______ | __________________________________________ |
| _____ | ______ | __________________________________________ |
| _____ | ______ | __________________________________________ |
| _____ | ______ | __________________________________________ |
| _____ | ______ | __________________________________________ |
| _____ | ______ | __________________________________________ |
| _____ | ______ | __________________________________________ |
| _____ | ______ | __________________________________________ |
| _____ | ______ | __________________________________________ |
| _____ | ______ | __________________________________________ |
| _____ | ______ | __________________________________________ |
| _____ | ______ | __________________________________________ |
| _____ | ______ | __________________________________________ |
| _____ | ______ | __________________________________________ |
| _____ | ______ | __________________________________________ |
| _____ | ______ | __________________________________________ |
| _____ | ______ | __________________________________________ |
| _____ | ______ | __________________________________________ |

___________________________
RAKEIDRA NEAL

DATED: ___________